MIGUEL A. HERNÁNDEZ AGOSTO ET AL., peticionarios apelados, *v.* CARLOS J. LÓPEZ NIEVES, SECRETARIO DEL DEPARTAMENTO DE AGRICULTURA DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado apelante.

*Número:* O-82-746 *Resuelto:* 3 de octubre de 1983

*Carmen Rita Vélez Borrás* y *Héctor Urgell Cuebas*, abogados del apelante; *Marcos A. Ramírez* y *Marcos Ramírez Lavandero*, abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El 10 de agosto de 1981 el Secretario de Agricultura, Hon. José A. Olivari López, designó Subsecretario de su departamento al Sr. Carlos J. López Nieves. Pocos días más tarde, el 4 de setiembre de 1981, el señor Olivari López renunció y el señor López Nieves pasó a ocupar su cargo interinamente.

El 18 de febrero de 1982 el señor Gobernador de Puerto Rico nominó al señor López Nieves para ocupar el cargo de Secretario de Agricultura y sometió su nombre a la consideración del Senado. El 7 de abril de 1982 el Senado rechazó el propuesto nombramiento del señor López Nieves. El señor López Nieves continuó ocupando el cargo de Secretario Interino.

El 16 de agosto de 1982 el señor Presidente del Senado y un grupo de senadores solicitaron del Tribunal Superior que ordenase al señor López Nieves abstenerse de ejercer las funciones de Secretario de Agricultura.

El 20 de octubre de 1982 el Tribunal Superior, Sala de San Juan, dictó, por voz del Hon. Peter Ortiz, sentencia sumaria que prohibía al señor López Nieves "continuar ejerciendo el cargo y las funciones del puesto de Secretario de Agricultura". El tribunal dispuso que la orden entraría en vigor a los cuarenta y cinco días de archivarse en autos copia de notificación de la sentencia. Paralizamos los efectos de esta sentencia, a petición del señor López Nieves, hasta tanto se resolviese el caso en su fondo.

I

La primera cuestión que plantea este recurso es si el señor Gobernador, quien no fue demandado, es parte indispensable del mismo. No surge de autos que el Secretario Interino demandado haya efectuado señalamiento alguno en instancia sobre el particular, mas resolvemos que el asunto es de orden tan relevante y vital que puede presentarse en apelación por primera vez o aun suscitarse por este Tribunal *sua sponte*. Véanse: 7 *Wright & Miller, Federal Practice*

& *Procedure: Civil* Sec. 1609, pág. 88 (1972); 3A *Moore's Federal Practice* Sec. 19.05[2], pág. 19-91 (1982); *Hoe* v. *Wilson,* 76 U.S. 501 (1869); *Martínez Moll* v. *Levitt & Sons of Puerto Rico, Inc.,* 583 F.2d 565 (1st Cir. 1978).

La Regla 16 de Procedimiento Civil de Puerto Rico (1979), referente a la acumulación indispensable de partes, dispone:

16.1. *Acumulación indispensable*

Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.

16.2. *Acumulación no indispensable ·*

El Tribunal podrá ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito.

La interpretación de esta regla y la determinación de su alcance dependen en gran medida de su extenso historial. Las palabras y conceptos que componen la regla son definibles tan solo en función de las realidades que los motivaron.

La doctrina sobre indispensabilidad de partes se originó en la práctica de las cortes inglesas de equidad, durante los siglos diecisiete y dieciocho. Antes de surgir la categoría de parte "indispensable" se hablaba tan solo de partes "necesarias" y de partes "adecuadas" o "inadecuadas". Aun en el caso de las partes "necesarias" el tribunal podía resolver el litigio en su ausencia. La categoría de parte "indispensable" se añadió posteriormente y desde entonces ha sido fuente de gran confusión. Se ha escrito, al analizarse su historia, que la doctrina "fue procreada por un *dictum* y vive por inercia". G. Hazard, *Indispensable Party: the Historical Origin of a Procedural Phantom,* 61 Colum. L. Rev. 1254, 1256

(1961). La nueva clasificación se refería a partes sin las cuales el tribunal no podía continuar el pleito. La regla descansaba en el principio de que las cortes deben impartir justicia completa, objetivo que es parte de la preocupación de la equidad inglesa, en una etapa antigua de su desarrollo, por la simetría de la forma, más que por la naturaleza del resultado. 9 Holdsworth, *A History of English Law* 347–348 (1966). Para el desenvolvimiento de la teoría de indispensabilidad, véanse: *Lowe* v. *Morgan*, 28 Eng. Rep. 1183 (Ch. 1784); *Fell* v. *Brown*, 29 Eng. Rep. 151 (Ch. 1787); *Palk* v. *Clinton (Lord)*, 33 Eng. Rep. 19 (Rolls 1805). Estos pleitos trataban de controversias sobre posesión o administración de inmuebles y otros derechos referentes al de propiedad. Se estableció la doctrina para proteger al demandado de otros posibles pleitos en su contra.

*Fell* v. *Brown*, supra, se convirtió en el caso principal y fue adoptado pronto en Estados Unidos. El Juez Story jugó un señalado y criticado papel en su propagación. J. Story, *Commentaries on Equity Pleadings*, 2da ed., 1940, pág. 78. La sentencia norteamericana más influyente sería, no obstante, *Shields et al.* v. *Barrow*, 58 U.S. (17 How.) 129, 139 (1854), caso claramente afectado por *Fell* y el análisis de Story, al cual cita. *Shields* difundió la antigua diferencia del Derecho inglés, defendida por Story, entre partes "necesarias" y partes "indispensables", al afirmar:

> The court here points out three classes of parties to a bill in equity. They are: 1. Formal parties. 2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court so that the court can proceed to a decree, and do complete and final justice without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest in the controversy,

but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience. Pág. 139.

*Shields* tuvo el efecto, no requerido necesariamente, de fomentar en el Derecho procesal norteamericano de la época una peligrosa tendencia a la clasificación obsesiva, a la pura actividad taxonómica desligada de toda consideración pragmática o valorativa. Los problemas de indispensabilidad de partes se resolvían a través del análisis abstracto de conceptos tales como "interés común", "separabilidad de derechos" y otros asociados con el deseo de encajar determinadas situaciones dentro de los encasillados de "parte necesaria" o "parte indispensable". J. Reed, *Compulsory Joinder of Parties in Civil Actions*, 55 Mich. L. Rev. 327, 355-356 (1957).

La clasificación de *Shields* y las doctrinas de equidad que éste representa fueron incorporadas en los códigos norteamericanos de enjuiciamiento civil del siglo XIX. De ahí pasaron a nuestro Código de Enjuiciamiento Civil de 1904, vía el impacto en este aspecto de nuestro Derecho de los códigos correspondientes de California, Idaho y Montana.

La Regla 19 federal de Procedimiento Civil proviene de las doctrinas descritas y retiene parte de la antigua terminología, lo cual ha provocado el mantenimiento, por algunos tribunales, de la rigidez e irrealidad de enfoque de la época "post-*Shields*". Se reconoce hoy generalmente, sin embargo, tanto por el Tribunal Supremo de Estados Unidos como por distinguidos comentaristas, que la Regla 19, según enmendada en 1966, se diseñó para descartar los viejos modos de determinar lo que constituye o no una parte indispensable. La acumulación obligatoria de partes ahora debe ser el resultado tan solo de consideraciones pragmáticas, de la evaluación de los intereses envueltos, lo que exige distinguir entre diversos géneros de casos. Wright & Miller, *op. cit.*,

Vol. 7, Sec. 1601, págs. 10–11; Reed, *op. cit.*, pág. 356; Moore, *op. cit.*, Vol. 3A, Sec. 19.01[5.-4], pág. 19-14. Nuestra Regla 16, antes citada, se funda en la Regla 19 federal. La interpretación de esta última goza, en consecuencia, de valor persuasivo en esta jurisdicción.

Cabe señalar, en primer término, que el caso de autos presenta una categoría de hechos distinta a las situaciones que dieron lugar al nacimiento y desarrollo de la doctrina de indispensabilidad. Se trata aquí, en parte, de precisar en un pleito contra un funcionario subordinado los contornos de la defensa de que un funcionario de mayor jerarquía tiene que ser demandado de por fuerza. El propio comité que propuso la versión actual de la Regla 19 reconoció la singularidad del problema. Moore, *op. cit.*, Vol. 3A, pág. 19-17. Consideremos, por tanto, el significado de algunos términos generales en este campo, para luego examinar la situación concreta ante nosotros.

■ La frase "interés común" de nuestra Regla 16, por ejemplo, no debe interpretarse por vía de criterios puramente semánticos. Ya que la Regla 19 federal no rompe enteramente con el pasado, las normas originalmente expuestas en *Shields* juegan todavía un papel importante en su interpretación, aunque sin desechar los efectos prácticos de su utilización en la situación particular bajo análisis. Moore, *op. cit.*, Vol. 3A, Sec. 19.05[1], págs. 19-80 a 19-84. "Interés común" no es cualquier interés en el pleito. Tiene que ser un interés de tal orden que impida la confección de un decreto sin afectarlo.

■ "Remedio completo" también tiene un significado especial. El remedio completo a que se refiere la Regla 16 alude al remedio entre las personas y entidades *que ya son partes en el pleito* y no al obtenible entre una parte y el ausente. Moore, *op. cit.*, Vol. 3A, Sec. 19.07-1[2], pág. 19-128; *Morgan Guaranty Trust Company of New York* v. *Martin*, 466 F.2d 593 (7th Cir. 1972).

La frase "sin cuya presencia no pueda adjudicarse la

controversia" no consta en la Regla 19 federal, pero claramente entronca con la antigua doctrina inglesa sobre la indispensabilidad. Para la forma limitada de su alcance en Puerto Rico, véanse: *Sucn. Molinary* v. *Central Los Caños, Inc.*, 54 D.P.R. 847 (1939); *Carrero Suárez* v. *Sánchez López*, 103 D.P.R. 77 (1974); *Alicea Álvarez* v. *Valle Bello, Inc.*, 111 D.P.R. 847 (1982). Examinemos a continuación el sentido de esta y otras frases en el contexto específico de hechos análogos a los presentes. Veremos que los factores a sopesar no coinciden por entero con los envueltos en otros casos.

En *Colorado* v. *Toll*, 268 U.S. 228 (1925), el Tribunal consideró un recurso de *injunction* contra el superintendente de un parque nacional, encaminado a prohibir que éste pusiese en vigor un reglamento promulgado por sus superiores. El funcionario demandado alegó que éstos, así como el Gobierno de Estados Unidos, eran partes indispensables. En tal situación de hechos, no cabe duda de que las personas y entidades ausentes habían de quedar "afectadas" por el auto solicitado, a grado aún mayor que en el caso de autos, y que, de interpretarse tan latamente los conceptos de "interés común" y "remedio completo" hasta privarlos de frontera, las partes debían haber sido declaradas partes indispensables. El Tribunal Supremo de Estados Unidos, por voz del Juez Holmes, resolvió lo contrario.

Por algunos años, el Tribunal Supremo de Estados Unidos hizo caso omiso de *Toll* y curiosamente se atuvo a la doctrina contraria de dos casos anteriores: *Gnerich* v. *Rutter*, 265 U.S. 388 (1924), y *Webster* v. *Fall*, 266 U.S. 507 (1925). Esta vacilación ha persistido hasta hoy en otros tribunales federales, mas no en el Tribunal Supremo de Estados Unidos. Dicho Tribunal regresó a la doctrina de *Toll*, la cual prevalece hasta el día de hoy. Véanse: *Williams* v. *Fanning*, 332 U.S. 490 (1947); *Hynes* v. *Grimes Packing Co.*, 337 U.S. 86, 96–97 (1949); *Shaughnessy* v. *Pedreiro*, 349 U.S. 48 (1955); *Ceballos* v. *Shaughnessy*, 352 U.S. 599 (1957).

No hemos hallado un solo caso relativo a vacantes en que

se haya determinado que el Presidente u otro funcionario con el poder máximo de nominación es parte indispensable.(¹) Por el contrario, en *Williams* v. *Phillips*, 482 F.2d 669 (1973), no se hizo parte al Presidente. En casos en que se afectaban otros poderes presidenciales de gran importancia, tampoco se hizo parte al Presidente. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 103 F.Supp. 569 (1952), 343 U.S. 579 (1952); *Myers* v. *United States*, 272 U.S. 52 (1926); *Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935); *United States* v. *Curtiss-Wright Corp.*, 299 U.S. 304 (1936).

Cuando se ha planteado ante este Tribunal la supuesta necesidad de demandar como parte indispensable a un funcionario de mayor jerarquía, cuya autoridad podía quedar afectada por una decisión, este Tribunal ha llegado a solución idéntica a la alcanzada en *Toll*. *Pérez Soto* v. *Corte de Distrito*, 38 D.P.R. 80 (1928); *Liggett & Myers Tobacco Co.* v. *Buscaglia, Tes.*, 64 D.P.R. 78, 86 (1944).(²)

*Pérez Soto* trataba sobre un *mandamus* contra un auditor municipal para que pagase al demandante unos sueldos que se le adeudaban, supuestamente. El demandado alegó que no había expedido los libramientos por orden del Auditor de Puerto Rico, quien a su juicio era parte indispensable. Resolvimos que no era imprescindible demandar al Auditor de Puerto Rico.

Razones de gran peso apoyan las doctrinas de *Toll* y *Pérez Soto* y su aplicación a este caso. Cuando el tercero ausente puede evitar un posible perjuicio contra él me-

---

(¹)*Assure Comp. Transp., Inc.* v. *Unites States*, 629 F.2d 467 (7th Cir. 1980), citado por la parte apelante, es inaplicable. El Tribunal resolvió la cuestión planteada: la legalidad de la Comisión de Comercio Interestatal, según parcialmente constituida. Esto se hizo en ausencia del Presidente. En *Assure* no se solicitó un *mandamus* para que el Presidente nombrase a los miembros restantes, como tampoco se solicita aquí remedio alguno contra el Gobernador.

(²)Para casos relativos al problema de la intervención, véanse: *Laborde* v. *Municipio de Isabela*, 38 D.P.R. 65 (1928); *Banco de Ponce, Inc.* v. *Municipio*, 39 D.P.R. 951, 956 (1929). Véanse, también, las expresiones de este Tribunal sobre la Regla 16 en *Hernández Agosto* v. *Romero Barceló*, 112 D.P.R. 407 (1982).

diante su comparecencia voluntaria o su intervención, mal puede escudarse tras la Regla 16. Aun presumiendo que pueda ocurrir un perjuicio, en sus manos está evitarlo. El comité redactor de la Regla 19 federal ha señalado la pertinencia de este factor de orden práctico, cuya importancia se ha reconocido por los tribunales y la doctrina. *Johnson* v. *Middleton*, 175 F.2d 535 (7th Cir. 1949); *Kentucky Natural Gas Corporation* v. *Duggins*, 165 F.2d 1011 (6th Cir. 1948); *McComb* v. *McCormack*, 159 F.2d 219 (5th Cir. 1947); Moore, *op. cit.*, Vol. 3A, Sec. 19.01[5.-4], pág. 19-15; *Developments in the Law—Multiparty Litigation in the Federal Courts*, 71 Harv. L. Rev. 874, 882 (1958). En los casos en que el tribunal de instancia considera propio hacerlo se recomienda que, a su discreción, el tribunal puede notificar al tercero ausente de la acción. Moore, *loc. cit.*

En el caso presente, surge de autos que el honorable Gobernador de Puerto Rico estaba enterado del pleito. Su propio abogado, el Secretario de Justicia, fue quien contrató la representación legal del demandado.

No hay indicación, además, del perjuicio a que se expone al tercero ausente. El decreto emitido en instancia no ordena al honorable Gobernador de Puerto Rico a hacer nada. Simplemente ordena al apelante a abstenerse de hacer lo que la ley, a juicio del tribunal de instancia, no le permite. El interés constitucional del honorable Gobernador de Puerto Rico en este caso estriba en el fiel cumplimiento de las leyes y no en que prevalezca tal o cual interpretación. No se le está sujetando en este pleito a mayor perjuicio que al que se sometió al Presidente de los Estados Unidos en *Sawyer*, en que estaba en juego nada menos que la facultad del Presidente para incautarse de propiedad privada en períodos de emergencia. Por supuesto que las decisiones en *Sawyer* y en los otros pleitos citados anteriormente afectaron los poderes del Presidente y de otros funcionarios concernidos mas, conforme el largo historial de la Regla 19, el interés afectado tiene que ser de índole real e

inmediata, al extremo de impedir la confección de un decreto adecuado. Wright & Miller, *op. cit.*, Vol. 7, Sec. 1609, págs. 93–94; Moore, *op. cit.*, Vol. 3A, Sec. 19.05[1], págs. 19-80 a 19-84. Este pleito no afecta las opciones que posee el honorable Gobernador de Puerto Rico. El decreto no le instruye a tomar curso alguno de acción. Aun cuando presumiésemos que el señor Gobernador tiene el requerido interés común con el apelante y que pueda resultar afectado por esta controversia, hipótesis ambas que chocan con la doctrina y la jurisprudencia, hemos visto que en sus manos estaba evitar el supuesto perjuicio.

■ Cabe por último señalar, que cuando el Estado o una de sus agencias o funcionarios es el tercero ausente, la tendencia moderna es a evitar dificultar la labor del demandante con planteamientos sobre partes indispensables. Véanse: 90 Stat. 2721 (1976); 5 U.S.C. secs. 702 y 703 (1976); K. C. Davis, *1982 Supplement to Administrative Law Treatise*, págs. 481–487. El Estado, sus agencias y funcionarios principales no son litigantes comunes. Su utilización de las Reglas de Procedimiento Civil debe guiarse, ante todo, por el deseo de allanar el camino de la justicia.

■ Por las razones expuestas, resolvemos que el Gobernador de Puerto Rico no es parte indispensable en el caso de autos.

## II

■ El Secretario Interino demandado plantea una segunda cuestión procesal. Sostiene que el remedio a que debió acudirse en este caso es el auto de *quo warranto*. El señalamiento es claramente inmeritorio. Está ampliamente reconocido que un grupo de senadores puede solicitar un *injunction* o una sentencia declaratoria para cuestionar la ocupación de un cargo por una persona, en detrimento del poder de confirmación del Senado. Véase: *Williams* v. *Phillips*, supra, caso instado por los senadores Williams, Mondale, Pell y Hathaway para evitar que el Presidente Nixon,

a quien no se le hizo parte, prescindiese, mediante un nombramiento interino, del juicio del Senado sobre la designación. Véase, también: Comment, *Temporary Appointment Power of the President*, 41 U. Chi. L. Rev. 146, 155–159 (1973).

 El argumento de que la ley *anti-injunction*, Ley Núm. 1 de 25 de febrero de 1946 (32 L.P.R.A. sec. 3524), representa otro obstáculo para la tramitación de este pleito, carece también de apoyo. Esta legislación obedeció al propósito de impedir la paralización del gobierno mediante alegaciones privadas de inconstitucionalidad. La legislación no persigue el objetivo de evitar que en pleitos revestidos de alto interés público no se puedan deslindar las respectivas facultades de dos ramas del gobierno en pugna.

Examinemos, en consecuencia, las cuestiones planteadas en sus méritos.

### III

La cuestión sustantiva central que plantea este litigio es si el apelante tiene derecho bajo la Constitución y las leyes de Puerto Rico a ocupar el cargo de Secretario de Agricultura. El problema requiere el análisis de las disposiciones legislativas pertinentes, a la luz de las doctrinas constitucionales relativas a los procesos de nombramiento e interinato y a la separación de poderes.

Sobre este particular la Constitución del Estado Libre Asociado de Puerto Rico y parte de nuestra legislación se apoyan en textos norteamericanos. Ello no significa que la interpretación de esos textos rija el significado de los nuestros. El trasfondo histórico de cada uno es distinto y produce en ocasiones normas diferentes. La Convención Constituyente y la Asamblea Legislativa de Puerto Rico estaban intentando muchas veces atender realidades diversas. Para captar el sentido de las disposiciones aplicables en casos como el de autos, conviene examinar el historial de ambos órdenes de textos y las condiciones que los produjeron.

El apelante invoca en este pleito el Art. 172 del Código Político, 3 L.P.R.A. sec. 546, el cual provee:

> En caso de muerte, renuncia o separación del jefe de algún departamento, oficina o negociado del Gobierno Estadual, o de la incapacidad o ausencia temporal de éste, el auxiliar o delegado del respectivo departamento, oficina o negociado, siempre que la ley no dispusiere en contrario, ejercerá el cargo de dicho jefe, mientras se nombre e instale el respectivo sucesor, o cese dicha incapacidad o ausencia.

El apelante argumenta que este artículo, junto a las disposiciones del Art. 7 de la Ley Núm. 60 de 25 de abril de 1940 (3 L.P.R.A. sec. 357) le permite desempeñar *ad aeternum*, siempre que no se nombre e instale a su sucesor, el cargo de Secretario Interino de Agricultura.

Es de interés, también, para el análisis de este caso el Art. 173 del Código Político, 3 L.P.R.A. sec. 547, el cual decreta:

> En todos los casos en que ni el jefe, ni el auxiliar o delegado de algún departamento, oficina o negociado del Gobierno Estadual, pudiere desempeñar las obligaciones del mismo, a causa de muerte, renuncia, separación, incapacidad o ausencia temporal, incumbirá al Gobernador, a su arbitrio y con la aprobación del Senado, disponer que el jefe de cualquier departamento, oficina o negociado, desempeñe las obligaciones del cargo, mientras se nombre el respectivo sucesor, o cese dicha incapacidad o ausencia temporal.

El contraste entre estas dos disposiciones del Código Político es curioso. El Art. 173 requiere que el nombramiento interino recaiga, cuando el auxiliar o delegado no esté disponible, en una persona que merezca la aprobación del Senado. El Art. 172, en cambio, guarda silencio sobre el particular y en consecuencia no prohíbe que ocupe el interinato el propio auxiliar o delegado, de existir éste, aunque su nombramiento no esté sujeto a confirmación por el Senado.

El Art. 7 de la citada ley orgánica del Departamento de Agricultura, 3 L.P.R.A. sec. 357, dispone a su vez:

El Subsecretario de Agricultura estará bajo la dirección del Secretario de Agricultura, ayudará a éste en sus funciones y tendrá a su cargo la supervisión de las divisiones, negociados, servicios, oficinas y dependencias del Departamento que el Secretario le asignare; podrá sustituir al Secretario en caso de ausencia, enfermedad o renuncia, y desempeñará, además, todos los deberes y obligaciones que le asigne el Secretario. [3]

[3] La legislación sobre el Departamento de Agricultura ha recorrido un camino accidentado. El Art. 18 de la Ley Jones creó en 1917 el Departamento de Agricultura y Trabajo. La Resolución Conjunta Núm. 2 de 30 de marzo de ese año, dispuso entonces que "El Comisionado de Agricultura y Trabajo nombrará un Subcomisionado de *Agricultura y Trabajo*" (énfasis nuestro), quien sustituiría al Secretario en caso de ausencia, muerte, destitución o renuncia.

La Ley Núm. 35 de 18 de junio de 1925 reorganizó el departamento. Se reiteró que el Subcomisionado de Agricultura y Trabajo, cuyo cargo se mantuvo a pesar de que por la Ley Núm. 65 de 16 de julio de 1921 se estableció el Negociado del Trabajo, sustituiría al Comisionado, pero se omitió la referencia a la forma de nombrar ál Subcomisionado. Esta ley no derogó la Resolución Conjunta de 1917, por lo que esta última continuó siendo la fuente del nombramiento del Subcomisionado de Agricultura y Trabajo.

La Ley Núm. 15 de 14 de abril de 1931 organizó como entidad separada al Departamento del Trabajo. La Ley Núm. 25 de 23 de abril de 1931 estableció a su vez el Departamento de Agricultura y Comercio. Su Art. 6 creó el cargo de "Subcomisionado de Agricultura", mas la ley no proveyó para la manera de su nombramiento. No se derogó la legislación original de 1917.

La Ley Núm. 60 de 25 de abril de 1940 reorganizó por completo el Departamento de Agricultura y Comercio. Su Art. 6 habló por primera vez de dos subcomisionados, uno de Agricultura y otro de Comercio. Se dispuso que uno u otro subcomisionado podría sustituir al Comisionado, pero no se especificó quién los nombraría. Esta ley derogó expresamente la Ley Núm. 25 de 23 de abril de 1931. No se mencionó la ley de 1917, pero se proveyó lo siguiente en su Art. 33:

"Por la presente se dispone que continuarán en pleno vigor y efectividad todas las leyes que hubieren sido promulgadas en relación con las funciones que desempeña el Departamento de Agricultura y Comercio, y quedan convalidados y ratificados todos los actos y actuaciones llevados a cabo por los funcionarios, juntas y empleados de dicho Departamento a tenor de las disposiciones de las citadas leyes."

El Art. IX, Sec. 8 de la Constitución del Estado Libre Asociado estableció que "De crearse un Departamento de Comercio, el departamento denominado de Agricultura y Comercio en esta Constitución, se llamará Departamento de Agricultura".

Sobre la base de esta disposición la Asamblea Legislativa de Puerto Rico creó el Departamento de Comercio de Puerto Rico por Ley Núm. 132 de 19 de julio de 1960. El Departamento de Agricultura quedó intocado.

En contraste con la ausencia de una disposición expresa que faculte al Secre-

Las cuestiones específicamente planteadas son tres: ¿Tiene término la ocupación interina de un cargo? ¿Qué papel juega, si alguno, en estas circunstancias la doctrina de separación de poderes? ¿Qué impacto tiene, si alguno, sobre el señor López Nieves el rechazo senatorial de su nominación para el cargo de Secretario de Agricultura? Las preguntas están relacionadas entre sí. Las discutiremos en conjunto.

---

tario de Agricultura a nombrar al Subsecretario —sin entrar por ahora a discutir el impacto de la ley de 1917— la práctica usual en el caso de otros departamentos ha sido la de estatuir específicamente que el Secretario nombrará al Subsecretario. Véanse, por ejemplo, las disposiciones correspondientes en los siguientes departamentos: el Departamento de Estado, 3 L.P.R.A. sec. 59; el de Justicia, 3 L.P.R.A. sec. 84; el de Hacienda, 3 L.P.R.A. sec. 238; el de Salud, 3 L.P.R.A. sec. 172; el del Trabajo, 3 L.P.R.A. sec. 313; el de Comercio, 3 L.P.R.A. sec. 437 y varios otros.

Podría argumentarse que, en vista de que en el caso del Departamento de Agricultura el cargo de "Subsecretario de Agricultura" no se crea técnicamente hasta 1931, ya que la ley de 1917 se refiere a un "Subcomisionado de Agricultura y Trabajo", resultaría que el nombramiento del señor López Nieves fue ilegal por haberse hecho en violación del Art. 162 del Código Político, 3 L.P.R.A. sec. 541, el cual provee:

"Todo funcionario, para cuyo nombramiento no se hubiere prescrito forma alguna en la Constitución del Estado Libre Asociado, o leyes de Puerto Rico, será nombrado por el Gobernador con el concurso y consentimiento del Senado."

Tal argumento exigiría la remoción instantánea del señor López Nieves como Secretario Interino de Agricultura. Consideramos, no obstante, que del historial reseñado y de su interpretación hasta ahora por las Ramas Ejecutiva y Legislativa del Gobierno de Puerto Rico, no surge con la necesaria claridad que haya sido la intención alterar el método de nombramiento del Secretario de Agricultura. Adviértase que el nombramiento de los subsecretarios de gobierno, en las agencias donde el cargo existe, que es la gran mayoría, se ha depositado esta facultad en manos del Secretario correspondiente y no del Gobernador, con el consejo y consentimiento del Senado. En segundo término cabe apuntar que nunca el Gobernador ha reclamado el poder de nominar ni el Senado de confirmar al Subsecretario de Agricultura hasta donde llega nuestro conocimiento. Las propias partes en el pleito de autos no discuten este asunto. Se ha presumido siempre que es al Secretario de Agricultura a quien le corresponde la facultad de nombramiento bajo la ley de 1917. Forzoso es concluir que se trata, a lo sumo, hasta que se disponga lo contrario por ley, de un ejemplo de desaliño en la redacción. Simplemente se ha estimado que la facultad original de nombrar al Subsecretario de Agricultura y Trabajo se modificó automáticamente para referirse tan solo al Subsecretario de Agricultura cuando se estableció separadamente un Departamento del Trabajo. Al ocurrir esto, la frase "y Trabajo" quedó derogada, subsistiendo la referencia original al "Subsecretario de Agricultura".

El Art. 172 del Código Político, como vimos, no impone término alguno a los interinatos, como tampoco la ley orgánica del Departamento de Agricultura, fundada en él. ¿A qué se debió ese peculiar rasgo de nuestro ordenamiento jurídico?

Cuando se aprobó el Art. 172 en 1902 —su texto no ha sufrido enmienda sustantiva alguna desde entonces— la situación en Estados Unidos era muy distinta. Nuestro Código Político deriva principalmente del de California de 1872, mas en California las vacantes tenían que ser cubiertas, a más tardar, al final de la próxima sesión de la Asamblea Legislativa o, en el caso de cargos electos, al celebrarse la próxima elección para tal propósito. 1 *Kerr's Cyc. Codes of California* Sec. 999 (1921). El término actualmente en vigor es mucho más reducido. Cal. Gov't Code Sec. 1774 (West 1980).

En el caso del gobierno federal, para el tiempo en que se aprobó nuestro Código Político, las vacantes que ocurriesen por causa de muerte o renuncia no podían tampoco cubrirse indefinidamente con funcionarios interinos. El término máximo de un interinato era de treinta días. 26 Stat. 733, Cap. 113 (1891). Tal es todavía la situación actual. 5 U.S.C. sec. 3348 (1976). Por varias décadas antes de 1891, los interinatos descritos no podían durar más de diez días. 18 Stat. 180, Tít. IV (1878). Desde el comienzo de la república se limitaron los nombramientos de receso, cuya extensión máxima se establece por la Sec. 2 del Art. II de la Constitución de Estados Unidos. 1 Stat. 415, Cap. XXI (1795). A juicio de los primeros procuradores generales, la intención de la Convención Constituyente fue que las vacantes no fuesen prolongadas. 1 Op. Att'y Gen. 631, 632 (1834). Véase: 2 Op. Att'y Gen. 525, 527 (1821). Es interesante observar, igualmente, que la ley federal sobre vacantes sólo permite que recaigan los nombramientos interinos en personas confirmadas por el Senado. *Temporary Appointment Power*, supra, pág. 153.

Para indagar la razón de esta diferencia entre el patrón federal y el que se estructura en 1902 para Puerto Rico, hay que remontarse a los inicios de la nación estadounidense y terminar con lo que sucedería luego aquí, tanto en lo que atañe al nombramiento de funcionarios ejecutivos como a la teoría de separación de poderes.

Los Artículos de Confederación concentraban la facultad de efectuar nombramientos exclusivamente en la Rama Legislativa. Véase: J. Burkoff, *Appointment and Removal under the Federal Constitution: the Impact of Buckley v. Valeo*, 22 Wayne L. Rev. 1335, 1339 (1976). En la Convención Constituyente de Estados Unidos chocó este concepto con su antítesis, la noción de que el primer ejecutivo debía poseer a solas esta facultad. El borrador inicial de la Constitución de Estados Unidos autorizaba al Presidente a solas a efectuar el nombramiento de todos los funcionarios, a excepción de los magistrados del Tribunal Supremo y los embajadores, que se nombrarían por el Senado. 1 Farrand, *The Records of the Federal Convention of 1787* Sec. 226 (1937). Edmund Wilson y otros favorecían la retención del modelo representado por los Artículos de Confederación. Comment, *The President Shall Nominate*, 33 Ill. L. Rev. 809 (1939).

A modo de transacción fue que se acordó evitar la concentración de poder, dividir la facultad de nombramiento entre la Rama Ejecutiva y la Legislativa, estructurar un delicado sistema de pesos y contrapesos entre los dos poderes. Hamilton fue quien sugirió, al principio sin éxito, la fórmula tan conocida hoy. Farrand, *op. cit.*, Vol. 1, págs. 292, 498–499. A la luz de este historial es que se explican las limitaciones que se le imponen a los interinatos. De no haber freno alguno, la balanza se hubiese inclinado peligrosamente a favor del poder ejecutivo. El requisito de que los interinatos se ejerzan por funcionarios confirmados por el Senado tiene la misma explicación. Hamilton defendía así, en *El Federalista* el poder de confirmación del Senado:

> It will readily be comprehended, that a man, who had himself the sole disposition of offices, would be governed much more by his private inclinations and interests, than when he was bound to submit the propriety of his choice to the discussion and determination of a different and independent body.... J. E. Cooke, *The Federalist*, ·Middleton, Connecticut, Wesleyan Univ. Press, 1961, No. 76, pág. 513.

Lo sucedido con la cláusula de nombramiento tuvo fuerte repercusión en la estructuración de la reputada versión estadounidense de la teoría sobre la separación de poderes. El borrador inicial de la Constitución no contenía huella alguna de la teoría. El poder se concentraba en manos del poder legislativo. J. P. Roche, *Constitutional Law: Distribution of Powers*, 3 International Encyclopedia of the Social Sciences 305 (1968). Durante el verano de 1787, con transacciones como la descrita, fue que se moldeó la doctrina. Madison explicaría más tarde:

> No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty than that on which the objection is founded. The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny. *The Federalist*, supra, No. 47, pág. 324.

Véase, también, *The Federalist*, No. 51, pág. 347 *et seq.*

La estructura de gobierno representada por la Ley Foraker no reconoció a plenitud la doctrina de separación de poderes. Se entremezclaron, en forma extraña a la expuesta en la Constitución de Estados Unidos, los poderes legislativo y ejecutivo. La cámara baja de la Asamblea Legislativa era la única electa por el Pueblo de Puerto Rico. La cámara alta era totalmente nombrada por el Presidente de Estados Unidos, con el consejo y asentimiento del Congreso, y estaba compuesta en su mayoría por los jefes de los departamentos ejecutivos.

El peculiar Art. 172 del Código Político de 1902 se entiende una vez se revela el clima ideológico que lo produjo. El signo de aquella época fue la concentración del poder y no la dispersión juiciosa de 1787. ¿Cómo esperar de aquel clima que se limitasen los interinatos o se le impartiese sentido al poder de confirmación cuando no existía un Senado responsable al pueblo para ejercerlo?

Ese senado se creó en 1917 por la Ley Jones, pero el poder legislativo, en su totalidad, quedó sujeto a tales cortapisas que no era razonable pensar que éste pudiese podar las facultades del gobernador nombrado por la metrópoli. Era una asamblea legislativa trunca, sin el poder de frenar eficazmente el del gobernador mediante la facultad de aprobar legislación a pesar de su veto. La decisión final en casos de tales choques entre el poder legislativo y el ejecutivo se confiaba al presidente. Tampoco puede afirmarse con rigor histórico que nuestro ordenamiento constitucional encarnaba en modo amplio la doctrina de la separación de poderes.

No es hasta 1952 que se consagra formalmente en la Constitución del Estado Libre Asociado (Art. I, Sec. 2) la existencia de tres poderes, subordinados todos por igual a la soberanía del Pueblo de Puerto Rico. "Separación de poderes", explicaba el Lic. Víctor Gutiérrez Franqui en la Asamblea Constituyente, al rechazar la insinuación de que una rama del gobierno podría predominar sobre las otras en toda circunstancia, "es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia". 1 *Diario de Sesiones de la Convención Constituyente* 591 (1951). El énfasis recayó, como es natural, en la separación, mas no en la independencia absoluta de los poderes entre sí. Lo segundo hubiese creado tres departamentos estancos, con libertad cada cual, por ejemplo, para interpretar a su modo la Constitución del país. El concepto de la independencia absoluta, sin más, es claramente antagónico al sistema de pesos y contrapesos

que ilustra la Constitución de Estados Unidos. Una enmienda propuesta para que la Constitución del Estado Libre Asociado exigiese tal independencia absoluta fue derrotada sin mayor discusión. 3 *Diario de Sesiones de la Convención Constituyente* 1918–1919 (1952).

La naturaleza e importancia de la doctrina de la separación de poderes ha sido objeto de análisis por este Tribunal o varios de sus miembros en distintas ocasiones. *Hernández Agosto* v. *Romero Barceló,* 112 D.P.R. 407 (1982); *In re Rodríguez Torres,* 106 D.P.R. 698, 700 (1978); *P.P.D.* v. *Ferré, Gobernador,* 98 D.P.R. 338, 429 (1970); *Banco Popular, Liquidador* v. *Corte,* 63 D.P.R. 66 (1944).

█ La doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno. En lo que atañe a nombramientos, la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación que le confieren la Constitución y las leyes. Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará únicamente a determinado candidato.

█ La Constitución del Estado Libre Asociado afecta obviamente el alcance del Art. 172 del Código Político. El principio de la separación de poderes no tolera los interinatos indefinidos. El Art. 172 responde a una filosofía superada ya por nuestro ordenamiento jurídico de hoy. Llega un momento en todo interinato en que se activa la cláusula de separación de poderes y el interinato tiene que cesar. De no ser así, podría evadirse con facilidad el poder de confirmación del Senado, inclinarse pesadamente la balanza del lado de la Rama Ejecutiva y romperse el equilibrio que persigue la cláusula de separación de poderes. A la luz de esta interpretación, ¿cuándo es que los interinatos quedan sin efecto en virtud del referido principio constitucional?

■ Veamos lo expuesto en el Art. IV, Sec. 4 de la Constitución del Estado Libre Asociado, con referencia a los nombramientos de receso:

> El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión. Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria. [4]

Estimamos que esta disposición provee la analogía necesaria para sentar las guías correspondientes. El paralelismo más señalado existe, claramente, entre los nombramientos de receso y los efectuados para cubrir vacantes. Resolvemos que, hasta tanto se disponga por ley un término más corto, todo interinato en cargos que requieran el consejo y consentimiento del Senado quedará sin efecto en virtud de la Constitución del Estado Libre Asociado de Puerto Rico, al levantarse la sesión ordinaria de la Asamblea Legislativa en curso o, en su defecto, la siguiente, al comienzo del interinato, [5] a menos que se efectúe antes el nombramiento en propiedad.

La Constitución del Estado Libre Asociado representa, en este sentido, una llamada al consenso y no una invitación a que la Rama Ejecutiva o la Legislativa intente imponerle a la otra su criterio. Los interinatos, como los nombramientos de receso, satisfacen una muy legítima necesidad operacional del Estado. Velan porque no medie interrupción en el servicio público entre tanto se alcanza ese consenso que la Constitución requiere entre los poderes políticos con respecto a ciertos nombramientos. Ni los interinatos ni los

---

[4] La Constitución de Estados Unidos, Art. II, Sec. 2, dispone que los nombramientos de receso expirarán "al finalizar la próxima sesión del Senado".

[5] La Comisión de la Rama Ejecutiva recomendó, inicialmente, a la Convención Constituyente que los nombramientos de receso sólo tuviesen efectividad hasta levantarse la próxima sesión ordinaria *o extraordinaria* de la Asamblea Legislativa. 4 *Diario de Sesiones de la Convención Constituyente* 2602 (1952). La frase subrayada se eliminó durante los debates. 3 *Diario*, supra, págs. 1853–1856; 4 *Diario*, supra, págs. 2335–2338.

nombramientos de receso pueden ser, sin embargo, razón para trastocar el fino balance de pesos y contrapesos que sostiene a nuestra estructura política. (6) A ello se debe el plazo fijado para que las Ramas Legislativa y Ejecutiva puedan llegar a un acuerdo que satisfaga sus correspondientes prerrogativas constitucionales. A partir de ese momento, el puesto quedará vacante, sin que pueda ser ocupado por persona que no cuente con nombramiento en propiedad. *Cf.* 5 U.S.C. sec. 3348; *Williams* v. *Phillips,* supra; *United States* v. *Lucido,* 373 F.Supp. 1142, 1149 (1974). El hecho de que la falta de dirección en un departamento del gobierno puede resultar altamente perjudicial para el país, no es sino razón para el ejercicio responsable de los deberes que la Constitución impone a los poderes políticos con relación a estos nombramientos.

Señalamos, para concluir, que reconocemos que el demandado, señor López Nieves, ha ocupado interinamente el puesto de Secretario de Agricultura desde plazo muy anterior al aquí fijado. Durante el período transcurrido, los poderes legislativo y ejecutivo no contaban con una clara interpretación de las disposiciones constitucionales en juego. Por ende, disponemos que no tendrá que cesar en sus funciones de Secretario Interino de Agricultura hasta tanto se cumplan treinta días a partir de la notificación de esta sentencia, fecha en que terminará automáticamente el interinato del señor López Nieves.

Por las razones expuestas, *se modificará la orden de injunction permanente dictada por el tribunal de instancia, conforme a lo resuelto en esta opinión y, así modificada, se confirmará.*

---

(6) En lo que atañe a los nombramientos de receso, el referido sistema de pesos y contrapesos en que se funda nuestra Constitución impediría la utilización de ese mecanismo para reponer en un cargo a una persona rechazada específicamente para ese puesto por el Senado. Hemos visto que los interinatos prolongados chocan con la Constitución del Estado Libre Asociado. No puede lograrse el mismo fin mediante el recurso de extenderle a la persona rechazada un nombramiento de receso.

El Juez Asociado Señor Dávila no intervino. Los Jueces Asociados Señores Negrón García y Rebollo López disintieron en opiniones separadas.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

El prestigio, validez y fuerza moral intrínsecos de una decisión judicial no sólo dependen de sus razonamientos, sino de darle oportunidad de enfrentarla por quien viene obligado a acatarla (*audi alteram partem*).

I

En buena metodología adjudicativa, la cuestión de si el Gobernador de Puerto Rico era y es parte indispensable sólo puede evaluarse y comprenderse precisando los importantes pronunciamientos que hoy se adjudican.

En síntesis, en virtud de un análisis histórico, estatutario y constitucional, el Tribunal *expresamente* resuelve que: (1) "[l]a doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno"; (2) "[e]n lo que atañe a nombramientos, *la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación* que le confieren la Constitución y las leyes" (énfasis suplido); (3) "todo interinato en que se activa la cláusula de separación de poderes y el interinato tiene que cesar. De no ser así, podría evadirse con facilidad el poder de confirmación del Senado, inclinarse pesadamente la balanza del lado de *la Rama Ejecutiva* y romperse el equilibrio que persigue la cláusula de separación de poderes" (énfasis suplido); (4) "todo interinato en cargos que requieran el consejo y consentimiento del Senado quedará sin efecto en virtud de la Constitución del Estado Libre Asociado de Puerto Rico, al levantarse la

sesión ordinaria de la Asamblea Legislativa en curso o, en su defecto, [al levantarse] la siguiente, al comienzo del interinato, a menos que se efectúe antes el nombramiento en propiedad" (escolio omitido); (5) "[a] *partir de ese momento, el puesto quedará vacante, sin que pueda ser ocupado por persona que no cuente con nombramiento en propiedad [debidamente confirmado]*" (énfasis suplido); (6) "[e]n lo que atañe a los nombramientos de receso . . . nuestra Constitución imp[ide] la utilización de ese mecanismo para reponer en un cargo a una persona rechazada específicamente para ese puesto por el Senado"; y (7) "[n]o puede lograrse el . . . fin [de interinatos prolongados] mediante el recurso de extenderle a la persona rechazada un nombramiento de receso".

Aunque no se formula ni expone, del análisis inteligente de esos pronunciamientos, la decisión de hoy cristaliza *sub silentio* uno de igual trascendencia que le sirve de ancla: la obligación constitucional del Gobernador de enviar al Senado, en la primera sesión ordinaria siguiente y dentro de un período de tiempo razonable —acorde con las circunstancias particulares en ese momento— todo nombramiento extendido durante el receso. 4 *Diario de Sesiones de la Convención Constituyente* 2338 (1952).

Sin prejuzgar esos pronunciamientos, al tenor de los mismos, resulta inconcebible la omisión de no habérsele demandado, aduciéndose que no se le está requiriendo nada. A tal efecto se sostiene que "[e]l decreto emitido en instancia no ordena al honorable Gobernador de Puerto Rico a hacer nada". Al profundizar, nos percatamos de que esa conclusión es errónea, contradictoria e incompatible con los pronunciamientos antes enumerados.

Ciertamente, al decretarse la vacante del Sr. Carlos J. López Nieves se crea una situación fáctica que ineludiblemente conlleva una obligación del señor Gobernador para con el Senado de someter un nombramiento, compelible mediante el vehículo de *mandamus*. *Hernández Agosto* v.

*Romero Barceló*, 112 D.P.R. 407 (1982). Esta última realidad de por sí es suficiente y expone palmariamente su indispensabilidad como parte. Como reconoce la opinión "el asunto [de si es indispensable o no] es de orden tan relevante y vital que puede presentarse en apelación por primera vez o aun suscitarse por este Tribunal *sua sponte*".(¹) Cumplimos con esa encomienda no sin antes plasmar que nos preocupa sobremanera la juridicidad de varias aseveraciones utilizadas como fundamento para convalidar la ausencia procesal del señor Gobernador. Examinémoslas.

Se da énfasis a que éste estuvo "enterado del pleito" a través de su propio abogado, el Secretario de Justicia. Se consigna, además, que la ausencia no lo expone a perjuicio, pues el "interés constitucional del honorable Gobernador de Puerto Rico en este caso estriba en el fiel cumplimiento de las leyes y no en que prevalezca tal o cual interpretación". Sobre la primera proposición, adviértase que el Secretario de Justicia —quien no era en este litigio su abogado— fue notificado en cumplimiento del requisito prescrito en la Regla 4.4(g) de Procedimiento Civil, aplicable al demandarse a López Nieves en su capacidad de funcionario público. *Corujo Collazo* v. *Viera Martínez*, 111 D.P.R. 552 (1981). El señor Gobernador no fue demandado y menos notificado apropiadamente. Nos preguntamos: ¿Desde cuándo en nuestro ordenamiento el conocimiento extrajudicial de una causa, sin que se cumpla con los requisitos de reclamación y notificación formal, es fuente que otorga o somete a una persona a la jurisdicción de un tribunal? Para

---

(¹) Sobre este extremo, el dictamen del ilustrado tribunal sentenciador es parco. Expuso que "[e]n este caso no se cuestiona que la parte con interés es el Secretario de Agricultura en funciones. *No hay planteamiento directo ante nos sobre falta de parte indispensable.* En este caso la situación es a la inversa del caso de *Hernández Agosto*, en que la única parte con interés era el Gobernador de Puerto Rico". (Énfasis suplido.)

Se deduce, pues, que dicho foro, en cierto sentido, fue inducido a error. Al no planteársele frontalmente la cuestión, estimó implícitamente que podía adjudicar la controversia sin la presencia, como parte indispensable, del señor Gobernador.

conferir jurisdicción sobre la persona de un demandado es menester que se expida un emplazamiento y se diligencie conjuntamente con la demanda. *A.F.F.* v. *Tribunal Superior*, 99 D.P.R. 310 (1970). No basta con que se entere de la existencia del pleito por otros medios, ni aun con que comparezca físicamente al recinto judicial. *Claudio* v. *Castilla Mojica*, 100 D.P.R. 761 (1972).

En cuanto a la segunda premisa, aunque de su faz la lógica resplandece, en su fondo se descolora. Admitidamente, el interés y misión constitucional del Primer Ejecutivo es la fiel observancia de las leyes y su correcta interpretación. Ahora bien, ¿no es ese mismo interés presumiblemente atribuible y extensivo a cualquier persona, en particular funcionarios públicos, legisladores, inclusive los jueces que integran los tribunales? ¿Significa, entonces, que puede prescindirse de incluir como parte demandada a quien realmente es indispensable en virtud de las alegaciones, controversias y derechos a adjudicarse, en función a ese interés de legalidad?

## II

Bajo el criterio definidor de *parte indispensable* plasmado en la Regla 16 de Procedimiento Civil vigente,([2]) el Primer Ejecutivo del país —como poseedor de la facultad y deber constitucional de iniciar el proceso de nominación y someter al Senado sus miembros de gabinete— genera pro-

---

([2]) En lo pertinente dispone:

"16.1. *Acumulación indispensable*

'Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.

"16.2. *Acumulación no indispensable*

"El Tribunal podrá ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito."

cesal y sustantivamente suficiente "interés común sin cuya presencia no pueda adjudicarse la controversia".

El precepto reglamentario aspira a proteger a la persona ausente de los efectos perjudiciales de un dictamen judicial y evitar la multiplicidad de litigios. Exige un enfoque jurídico consistente con la equidad y conciencia de índole circunstancial o pragmática, aspecto que configura su existencia y sustancia propia en virtud de factores particulares en el contexto de cada caso, tales como tiempo, lugar, modo, alegaciones, prueba, clase de derechos, intereses en conflicto, resultado y finalidad. "Esta regla entronca con la cláusula constitucional sobre debido procedimiento de ley." II *Práctica Procesal Puertorriqueña*, Publicaciones JTS (1979), pág. 212. A tal efecto, en *Carrero Suárez* v. *Sánchez López*, 103 D.P.R. 77, 78 (1974), reiteramos que "[e]sencia del debido proceso de ley es que nadie sea privado de su propiedad sin darle oportunidad de ser oído". Proceder de manera contraria, ofende principios elementales y choca con el instinto de justicia que todos albergamos en nuestro espíritu. Por ende, el juzgador no puede circunscribir su decisión a un simple análisis literal de las alegaciones de la parte actora, o a quién éste, unilateralmente, escogió demandar o cómo intituló la acción. Para una adjudicación legítima debe auscultar y detectar en su íntima sensibilidad judicial si se han traído correctamente ante el foro todos los titulares indispensables. Con visión integral y clarividencia profunda, debe ir más allá de su faz y evaluar el contenido y valor sustantivo de tales alegaciones, su suficiencia, los derechos en controversia y la naturaleza y pluralidad del remedio final a proveerse.

A poco reflexionemos notamos que, objetivamente, concurren todos los requisitos para estimar parte indispensable al señor Gobernador. De la propia opinión del Tribunal surge que lo que está realmente en juego es su facultad para retener en funciones interinas a una persona cuyo nombramiento como miembro de su gabinete le fue previamente

rechazado por el Senado. Así lo expusieron los demandantes desde el primer momento en sus alegaciones. Aunque extrañamente optaron por no demandarlo, para configurar cabalmente la causa de acción, inevitable e ineludiblemente, tuvieron que formular alegaciones alusivas a su persona cuestionando sus actuaciones, consistentes en respaldar el interinato de López Nieves durante el cuatrienio que discurre y su negativa a nominar a otra persona. Los acápites pertinentes de la petición rezaban:

7. *El Gobernador de Puerto Rico, Hon. Carlos Romero Barceló, ha justificado y ha endosado públicamente las actuaciones del Demandado y lo ha respaldado para que continúe durante el resto del cuatrienio en el desempeño de las funciones de Secretario de Agricultura, a pesar del rechazo expreso por parte del Senado. Ha manifestado, además, que no se propone nombrar ninguna otra persona* para el cargo de Secretario de Agricultura durante el próximo cuatrienio *y permite* al Demando que ejerza las funciones de ese cargo vía la ocupación del cargo de Subsecretario de Agricultura.

8. . . . . . . . .

9. De permitirse que el Demandado continúe ejerciendo las funciones del Secretario de Agricultura, vía el mecanismo de que ocupa el cargo de Subsecretario, puesto para el cual no se requiere el consejo y consentimiento del Senado, *se estaría permitiendo que mediante un proceso de circu[n]valación (circumvent) se tornará en absolutamente ineficaz el mecanismo de consejo y consentimiento del Senado, privándose así al Senado,* y a los Demandantes de efectuar su poder compartiendo su nombramiento de los secretarios de Gobierno que le ha sido otorgado por el artículo 4, Sec. 5, de nuestra Constitución.

10. Las actuaciones del Demandado en la capacidad de Secretario de Agricultura, sean en carácter de interino o de cualquier otra forma, son ilegales por carecer su nombramiento de validez constitucional dado el rechazo de su designación por parte del Senado de Puerto Rico; *causando tales actuaciones ilegales un daño irreparable al Senado de Puerto Rico y a los Demandantes como miembros de ese Cuerpo y como miembros de las Comisiones asignadas a trabajar en el*

*proceso de confirmación* y con legislación y los asuntos concernientes al Departamento de Agricultura. (Énfasis suplido.)

Su lectura causa una sola impresión. Es como si originalmente el señor Gobernador hubiese sido incluido como demandado en el epígrafe y subsiguientemente, por alguna misteriosa razón, fue eliminado. Esta apreciación queda fácilmente corroborada mediante una prueba sencilla, pero objetiva. Bajo la hipótesis de habérsele demandado, ¿hubiese prosperado una moción de desestimación por él promovida? En recta inteligencia judicial, la contestación es en la negativa. La demanda aduce hechos suficientes, constitutivos de una causa de acción en su contra.

La causa de acción, inexorable e inextricablemente, está ligada y descansa en las actuaciones directas del señor Gobernador. Así lo aquilató y dictaminó el tribunal de instancia al concluir:

> *Es indudable que el mantener en un puesto a un funcionario que ha sido expresamente rechazado por el Senado por un período de más de seis meses (abril a octubre) viola los más elementales principios de la doctrina de separación de poderes.* Equivocado o no, el Senado emitió su juicio. *La actuación del Poder Ejecutivo al mantener al demandado ejerciendo las funciones reales del cargo es soslayar la voluntad del Senado; es convertir en letra muerta los derechos y prerrogativas que le otorga la Constitución a la rama legislativa.* Ante ese cuadro no puede prosperar la interpretación literal, por no llamarla legalista, del demandado, de que el estatuto le permite seguir actuando como Secretario Interino del Departamento de Agricultura. No hay duda de que dicha facultad emana de la sección 337, pero la misma no controla la situación ante nos. (Énfasis suplido.)

Nuestra decisión no sólo confirma ese fallo, sino que lo trasciende al reubicar y fijar nuevas coordenadas en el plano constitucional. Además de enjuiciar y anular la acción del Primer Ejecutivo sin darle audiencia, por primera vez se prejuzga e interpreta la dinámica constitu-

cional entre ese poder y el Senado. Se reformulan, además, deberes e imponen obligaciones recíprocas que van a la entraña misma de la doctrina de separación de poderes. Se llega al extremo de imponer serias limitaciones a la prerrogativa ejecutiva de extender nombramientos de receso jamás contempladas en nuestra Constitución. Difícilmente puede concebirse un litigio en que, para un gobernador, exista un interés tan real y patente como el de autos. Siguiendo el razonamiento de la opinión, ¿no es este interés "de tal orden que impid[e] la confección de un decreto sin afectarlo"?

Después de esta decisión, preguntamos: si el señor Gobernador no llena la vacante creada, ¿queda algo más por discutir y adjudicar que no sea, *por vía de epílogo incompleto y en pleito independiente*, aclararla y exigirle que lo haga? Presumiendo la existencia de ese otro litigio, ¿estará este Tribunal, a la luz de sus planteamientos, en disposición de reexaminar, reconsiderar y modificar sus pronunciamientos o será un *fiat accompli*? Procesalmente, su presencia es insoslayable.

### III

Lo expuesto bastaría para disponer del recurso. Sin embargo, se vulnera la Regla 16 en otro aspecto esencial. Como hemos dicho, la opinión no evita, sino que tiende a promover al menos otro pleito. Obsérvese que la denominación de *injunction* es irrelevante. Pudo intitularse "sentencia declaratoria", *quo warranto* o *mandamus* y ello no hubiese alterado la verdadera *pluralidad* de la causa de acción y su desenlace. Tales designaciones no desvirtúan la naturaleza *dual* del remedio pretendido y adjudicado en sus dos dimensiones reales: ordenar al señor López Nieves que cese en el cargo y compeler al señor Gobernador a nombrar un sustituto. Al resolverse que éste no es parte indispensable, la sentencia es vaga e inconclusa. Veamos.

Al decretarse la vacante por orden judicial, ¿puede

afirmarse persuasivamente que finalizó este episodio judicial? ¿Puede sostenerse seriamente que el señor Gobernador no viene obligado a llenarla en algún momento? Después de esta decisión, ¿le queda alguna opción? Estas interrogantes no pueden soslayarse a base de argüir que el "decreto no le instruye a tomar curso alguno de acción". Si así fuera, el remedio sería trunco y fugaz.

Representaría tres posibilidades. Primeramente, la admisión de que el poder judicial simplemente ha incurrido en un ejercicio académico y vacío, pues ha proclamado la vigencia de una Constitución abstracta e inoperante.

La segunda posibilidad que visualizamos es que el Tribunal, sin desearlo, haya decretado una solución anárquica. Mientras el señor Gobernador y el Senado debaten y buscan un consejo, temporalmente un departamento ejecutivo habrá quedado acéfalo, sin dirección y a la deriva, interrumpidas y paralizadas, *pro tanto*, la estabilidad y continuidad de los servicios esenciales que presta a la ciudadanía.

Y tercero, aunque no tenemos el beneficio de un análisis concreto y persuasivo, la única forma excogitable de poder sostener jurídicamente la tesis de que el señor Gobernador puede optar por no hacer nada, sería remitiendo la cuestión al foro del juego político y a la opinión pública. Para esta disyuntiva habría que recortar más la facultad constitucional en cuanto a nombramientos de receso. Conllevaría resolver que también existe un impedimento *absoluto* a llenar *de ese modo* una vacante creada en virtud de haber cesado un interinato al finalizar una sesión ordinaria. Erigido ese obstáculo —ante el problema administrativo mayúsculo y la presión de la opinión pública— teóricamente, el Primer Ejecutivo se vería forzado a buscar, a la brevedad posible, el consenso del Senado para solucionarlo y darle dirección a uno de sus departamentos. ¿Se evita por este medio el trastocar el fino balance de pesos y contrapesos que sostiene a nuestra estructura política?

Bajo nuestra arquitectura constitucional, ninguna de las tres ramas de gobierno puede reclamar horizontes ilimitados. Ahora bien, ¿dónde se trazan los linderos en el delineamiento decisorio de la ramificación de esos poderes? ¿Cuál de las anteriores alternativas es la jurídicamente correcta y sabia? Estas preguntas constituyen dilemas que en función de oráculos a destiempo no nos corresponde investigar y decidir en esta etapa procesal. Simplemente, las hacemos para ilustrar las complejidades de las cuestiones sustantivas centrales y la indispensabilidad del señor Gobernador en el caso. *Las mismas surgen al aferrarse a la errónea posición de que la decisión no le obliga a actuar, como único medio para subsanar la omisión procesal.*

Aun sin dirigirnos por esas y otras avenidas inexploradas, subsiste la incógnita inicial: si no viene obligado a hacer nada, ¿cómo entonces explicar la tesis por analogía de interinato limitado, apoyada precisamente en su obligación original de someter la nominación al Senado, y el derecho de éste de compartir en la determinación de los nombramientos de miembros del gabinete?

## IV

Aun cuando se dejan lagunas, más allá de la inventiva de la gramática e imaginación judicial, es irrefutable que nuestro mandato a corto plazo crea una vacante en un puesto cuyo sucesor precisa de un nombramiento que oportunamente debe llenar el Primer Ejecutivo, sujeto a la confirmación del Senado. Ese es el reclamo real y destino final del pleito. La situación se rige y controla por la decisión de *Hernández Agosto* v. *Romero Barceló*, supra. No es menester acudir a casos de la jurisdicción norteamericana. En ninguno se planteó ni resolvió expresamente la cuestión que nos ocupa. *A contrario sensu* nuestra reciente doctrina, según expuesta en la mencionada decisión, lo hizo. Sus fundamentos conservan suficiente vitalidad y fuerza persuasiva.

Allí, en cuanto a un "interés" de idéntica intensidad y naturaleza, a saber, la encomienda de cumplir con el deber de nominar a varios funcionarios y remitirlos al Senado, sostuvimos que el Gobernador era *"la única parte indispensable en [el] recurso"*. (Énfasis suplido.) *Hernández Agosto*, supra, pág. 412. En el que nos ocupa, el único demandado, señor López Nieves, está en la misma situación en que se encontraban aquellos incumbentes. Dijimos: "Como ya vimos, la razón de pedir en este caso, el envío de las nominaciones de los funcionarios concernidos al Senado . . . nada puede requerirles *porque ellos no tienen incumbencia en el asunto.*" (Énfasis suplido.) *Hernández Agosto*, supra, pág. 413. Ese razonamiento, válido entonces, aplica al presente. No podemos descartarlo. Sin embargo, curiosamente, la opinión reduce el valor de *stare decisis* de *Hernández Agosto* v. *Romero Barceló*, supra, a dos líneas en el escolio (2), mientras que eleva a rango de precedentes los antiguos casos de *Pérez Soto* v. *Corte de Distrito*, 38 D.P.R. 80 (1928), y *Liggett & Myers Tobacco Co.* v. *Buscaglia, Tes.*, 64 D.P.R. 78 (1944). Una simple lectura, sin mucho esfuerzo mental, pone de manifiesto que los intereses en conflicto en ambos casos remotamente comparan con la importante facultad constitucional de nombramientos del Primer Ejecutivo y las prerrogativas del Senado. (³)

Si bien se pretende, el caso de autos no es susceptible de ser válidamente distinguido mediante una errónea o confusa denominación del pleito. Evitemos sucumbir ante el magnetismo incontrolable de las palabras y los efectos hipnóticos de los títulos o epígrafes. Lo determinante es percibir su verdadera naturaleza atendidas las alegaciones, prueba y remedios. Aunque se le excluyó, la razón de pedir

---

(³) El "interés" atribuible al Auditor de Puerto Rico es de índole superficial. El primero trataba de si el auditor municipal desembolsaba unos cheques para pagar el sueldo del alcalde. El otro, si un empleado de su oficina presenciaba el proceso de destruir unos sellos de rentas internas en el Departamento de Hacienda.

es la misma: forzar al señor Gobernador a que remita al Senado la nominación del Secretario de Agricultura. López Nieves, como único demandado, carece de capacidad para representarlo. No tiene control ni injerencia alguna en esa omisión ejecutiva. Tampoco sobre las posiciones e interpretaciones que asume el señor Gobernador en cuanto al alcance de la ley y la Constitución. Simplemente, aquél es un funcionario que cumple y está subordinado al mandato de interinato preceptuado en el Art. 7 de la Ley Núm. 60 de 25 de abril de 1940 (3 L.P.R.A. sec. 357). Esa ley se presume constitucional y no ha sido impugnada ni invalidada. Precisamente, para cuajar la decisión se cualifica y condiciona su interinato limitando los poderes fundamentales de su superior jerárquico, el Primer Ejecutivo.

Ahora bien, aun prescindiendo del anterior examen, igual resultado se impone aplicando la norma federal vigente. El superior jerárquico es parte indispensable "si el decreto concediendo el remedio le requiere que actúe, ya sea mediante el ejercicio directo de un poder que reside en él, o disponiendo que un subordinado lo haga". 7 *Wright & Miller, Federal Practice and Procedure: Civil* Sec. 1622, pág. 222 (1972).

## V

Recapitulando. Desde sus inicios en instancia, sin dificultad alguna, la pesquisa judicial se perfiló en su correcta perspectiva: una pugna entre el Primer Ejecutivo y la cámara alta en cuanto a la definición de varios de sus respectivos atributos constitucionales, tomando como trasfondo fáctico el interinato del señor López Nieves.

La decisión de hoy interpreta el alcance y contenido del poder de nominación del Gobernador de Puerto Rico. Sobre todo, va más allá. Lo poda. Aunque aspira a "logr[ar un] equilibrio", el inventario final es un poder ejecutivo cercenado. Además, expone el derecho del Senado en ese proceso como nervio primario para cimentar los límites de un inte-

rinato y crea una vacante que oportunamente requerirá y obliga a una acción ejecutiva. Lamentablemente todo ello se hace sin incluírsele como parte ni dársele oportunidad de ser oído, no obstante ser forzosamente litisconsorte como cotitular constitucional y partícipe de esos derechos adjudicados en este singular drama judicial (*inaudita altera pars*).

El análisis que precede y las interrogantes planteadas reflejan, incuestionablemente, que procede la presencia del Primer Ejecutivo en controversias judiciales como la que nos ocupa, en que a iniciativa del Senado se litigan, directa o indirectamente, prerrogativas fundamentales de su cargo. Éste es el axioma aplicable y debería prevalecer. Una estricta juridicidad y la observancia del protocolo judicial mínimo que corresponde y debemos, sin distinción, hacia los otros poderes constitucionales lo aconsejan e imponen. "[A]precia[mos] como el mejor de los textos el sentido común." A. Ossorio, *El Alma de la Toga.*

Queda demostrado que el señor Gobernador era y es parte indispensable. Su interés constitucional es "real e inmediato". Ante el incumplimiento inexplicable por los demandantes apelados de lo dispuesto en la Regla 16.1, el foro judicial debió concederles plazo para traerlo al pleito, y en su defecto, desestimar la acción conforme las Reglas 18 y 10.2 vigentes.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Está ampliamente reconocido que bajo el sistema democrático de gobierno que rige en Puerto Rico, la Rama Judicial es la máxima intérprete de nuestra Constitución así como la llamada a definir los contornos y la validez del ejercicio de las facultades de las otras dos ramas de gobierno. [1]

---

[1] *Santa Aponte* v. *Srio. del Senado,* 105 D.P.R. 750 (1977); *Santa Aponte* v. *Ferré Aguayo,* 105 D.P.R. 670 (1977).

Estamos obligados a ejercitar la citada facultad, sin embargo, tratando siempre de mantener un "fino balance" entre los derechos y prerrogativas de cada una de las otras dos ramas.

No obstante la existencia en nuestro ordenamiento jurídico de un estatuto que clara y expresamente prohíbe la utilización, en situaciones como la presente, del recurso mediante el cual la parte demandante acudió ante el foro judicial y del hecho de que al así hacerlo ésta no incluyó, como demandada, a una parte indispensable, este Tribunal resuelve, en el día de hoy, que el Subsecretario en propiedad del Departamento de Agricultura de Puerto Rico debe cesar en sus funciones de Secretario Interino de dicho departamento.

Fundamenta dicha decisión aduciendo que las únicas y vigentes disposiciones legales en nuestra jurisdicción referentes a la materia en controversia fueron el producto de una época en nuestra historia —preconstitución del Estado Libre Asociado de Puerto Rico— en donde nuestra Asamblea Legislativa era una "trunca", que estaba sujeta a "tales cortapisas que no era razonable pensar que [ésta] pudiese podar las facultades del Gobernador nombrado por la metrópoli", y que dicho articulado "responde a una filosofía superada ya por nuestro ordenamiento jurídico de hoy", llegando "un momento en todo interinato en que se activa la cláusula de separación de poderes [de nuestra Constitución] y el interinato tiene que cesar".

La decisión que hoy emite la mayoría de este Tribunal pasa por alto que con posterioridad al advenimiento de nuestra Constitución la Asamblea Legislativa de Puerto Rico no sólo ratificó las referidas disposiciones legales, sino que en varias ocasiones aprobó legislación similar en relación con departamentos del gobierno de nueva creación, lo cual es indicativo de lo erróneo de la tesis sostenida por la mayoría.

Al así hacerlo, en adición y por fíat judicial, establece

una norma rígida e inflexible, la aplicación de la cual perjudica innecesariamente a la Rama Ejecutiva al trastocar ese "fino balance" que a toda costa debemos preservar entre las otras ramas de gobierno y la cual de por sí atenta contra el principio de separación de poderes que la opinión de la mayoría pretende salvaguardar. Es por ello que me veo obligado a disentir.

## I

*Los hechos*

Con motivo de la renuncia del Secretario del Departamento de Agricultura de Puerto Rico, el 4 de septiembre de 1981 el aquí demandado Carlos J. López Nieves, Subsecretario en propiedad del referido departamento, comenzó a ejercer *en forma interina* los deberes y funciones del cargo de Secretario, *ello en cumplimiento de las expresas disposiciones a esos efectos tanto del Art. 172 del Código Político de Puerto Rico, 3 L.P.R.A. sec. 546 como del Art. 7 de la Ley Núm. 60 de 25 de abril de 1950 (3 L.P.R.A. sec. 357).*

Posteriormente, habiendo sido nominado el Subsecretario López Nieves por el honorable señor Gobernador de Puerto Rico para el cargo de Secretario en propiedad del Departamento de Agricultura, nombramiento que fue rechazado por el Senado de Puerto Rico, el referido demandado continuó desempeñando *en forma interina* las funciones de Secretario de dicho departamento en virtud, repetimos, del cargo de Subsecretario en propiedad que ocupaba y como consecuencia de la obligación y facultad legal que le imponen y le confieren, respectivamente, las ya mencionadas disposiciones de ley.

Alegando, en lo pertinente, que las *"actuaciones* del Demandado en la capacidad de Secretario de Agricultura, sean en carácter de interino o de cualquier otra forma, *son ilegales* por carecer su nombramiento de validez constitucional *dado el rechazo de su designación por parte del Senado de Puerto Rico"* (énfasis suplido), el honorable señor

Presidente del Senado de Puerto Rico, en unión a otros miembros de ese alto cuerpo, radicó ante el honorable Tribunal Superior de Puerto Rico, Sala de San Juan, una petición de *injunction* contra el aquí demandado apelante Carlos J. López Nieves, en la que solicitaron de dicho tribunal que emitiera "un *auto de Injunction Preliminar* y, posteriormente, un *auto de Injunction Permanente*, ordenando al Demandado *que se abstenga de ejercer* las funciones de Secretario de Agricultura, *ya sea en su carácter de Subsecretario* o en cualquier otra forma". (Énfasis suplido.)(²)

Expedida por el tribunal de instancia una orden dirigida al demandado para que mostrara causa por la cual no se debía declarar con lugar la referida petición de *injunction*, y habiendo sido citado el demandado, éste radicó una moción de desestimación y/o sentencia sumaria, en la cual alegó, en síntesis, que la parte demandante carecía de una causa de acción en contra del demandado, por cuanto en su calidad de Subsecretario del Departamento de Agricultura tiene el "deber ministerial de actuar como Secretario Interino de Agricultura en ausencia del Secretario", deber que le fue impuesto "por la propia ley", y que el recurso de *injunction* radicado por la parte demandante era improcedente en derecho, en virtud de las disposiciones del Art. 678, incisos 3 y 5 del Código de Enjuiciamiento Civil de Puerto Rico, 32 L.P.R.A. sec. 3524. Dicha moción fue argu-

---

(²) No se incluyó como demandado al honorable señor Gobernador de Puerto Rico. En el párrafo núm. 7 de la petición de *injunction*, sin embargo, se expresa que:

"El Gobernador de Puerto Rico, Hon. Carlos Romero Barceló, ha justificado y ha endosado públicamente las actuaciones del Demandado y lo ha respaldado para que continúe durante el resto del cuatrienio en el desempeño de las funciones de Secretario de Agricultura, a pesar del rechazo expreso por parte del Senado. Ha manifestado, además, que no se propone nombrar a ninguna otra persona para el cargo de Secretario de Agricultura durante el próximo cuatrienio y permite al Demandado que ejerza las funciones de ese cargo vía la ocupación del cargo de Subsecretario de Agricultura. Tales manifestaciones están contenidas en información de prensa del día 20 de abril de 1982 en los periódicos *El Nuevo Día, San Juan Star, El Mundo* y *El Vocero*, las cuales se hacen formar parte de esta Petición como Exhibit 5, 6, 7 y 8, respectivamente."

mentada por las partes en una vista celebrada ante el tribunal de instancia el 7 de septiembre de 1982, quedando sometido el asunto.

Con fecha de 20 de octubre de 1982, el honorable Tribunal Superior de Puerto Rico, Sala de San Juan, —Hon. Peter Ortiz, Juez— dictó sentencia sumaria mediante la cual declaró con lugar la demanda radicada y dictó "orden de Injunction Permanente prohibiéndole [*sic*] al demandado, Hon. Carlos J. López Nieves, continuar ejerciendo el cargo y las funciones del puesto de Secretario de Agricultura".

El tribunal de instancia adujo, en apoyo de su sentencia, dos fundamentos, a saber:

1—*Es indudable que el mantener en un puesto a un funcionario que ha sido expresamente rechazado por el Senado por un período de más de seis meses* (abril a octubre) *viola los más elementales principios de la doctrina de separación de poderes.* Equivocado o no; por razones puramente político-partidistas o no, el Senado emitió su juicio. *La actuación del Poder Ejecutivo al mantener al demandado ejerciendo las funciones reales del cargo es soslayar la voluntad del Senado; es convertir en letra muerta los derechos y prerrogativas que le otorga la Constitución a la rama legislativa.* Ante ese cuadro no puede prosperar la interpretación literal, por no llamarla legalista, del demandado, de que el estatuto le permite seguir actuando como Secretario Interino del Departamento de Agricultura. No hay duda de que dicha facultad emana de la sección 357, pero la misma no controla la situación ante nos. [3] (Énfasis suplido.)

Citando el caso de *Williams* v. *Phillips*, 360 F.Supp. 1363 (1973), expresó que:

_____

[3] Procede tener presente, *en relación con la controversia sobre "parte indispensable"*, que el propio tribunal de instancia consideró que el que mantenía "al demandado ejerciendo las funciones reales del cargo" era el "Ejecutivo", o sea, el honorable Gobernador de Puerto Rico; ello a pesar de que éste nunca fue traído al pleito, ni por la parte demandante ni por orden a esos efectos del propio tribunal de instancia.

2—Independientemente del hecho de que el Sr. López Nieves fue rechazado por el Senado, entendemos que los demandantes tendrían derecho al remedio solicitado. Aunque el demandado nunca hubiera sido nominado como secretario en propiedad, un interinato por más de seis meses también afecta adversamente los derechos y prerrogativas del Senado.

## II

*Procedencia del recurso interpuesto*

El citado Art. 172 del Código Político de Puerto Rico dispone:

En caso de muerte, *renuncia* o separación del *jefe* de algún *departamento*, oficina o negociado del *Gobierno Estadual*, o de la incapacidad o ausencia temporal de éste, el *auxiliar* o delegado *del respectivo departamento*, oficina o negociado, siempre que la ley no dispusiere en contrario, *ejercerá el cargo de dicho jefe, mientras se nombre e instale el respectivo sucesor*, o cese dicha incapacidad o ausencia. (Énfasis suplido.)

Por otro lado, el citado Art. 7 de la Ley Núm. 60 de 25 de abril de 1940 dispone, en lo pertinente, que:

*El Subsecretario de Agricultura* estará bajo la dirección del Secretario de Agricultura, ayudará a éste en sus funciones y tendrá a su cargo la supervisión de las divisiones, negociados, servicios, oficinas y dependencias del Departamento que el Secretario le asignare; *podrá sustituir al Secretario en caso de ausencia, enfermedad o renuncia*, y desempeñará, además, todos los deberes y obligaciones que le asigne el Secretario. (Énfasis suplido.)

Como consecuencia inexorable de las anteriores transcritas disposiciones legales, al ocurrir la renuncia del Secretario en propiedad del Departamento de Agricultura de Puerto Rico, el señor López Nieves, por su condición de Subsecretario, no sólo estaba autorizado, sino obligado, a asumir las funciones del cargo de Secretario Interino del referido departamento; de hecho, entendemos que la única forma en que el señor López Nieves podría evitar el tener

que asumir y/o seguir desempeñando dichas funciones es mediante su renuncia al cargo de Subsecretario.

En otras palabras, la *"actuación"* del señor López Nieves, en su carácter de Subsecretario, *de ocupar el cargo de Secretario Interino y/o desempeñar* las funciones del mismo, al igual que *las demás "actuaciones"* que conlleva el desempeño del cargo en sí de Secretario Interino, *son actuaciones autorizadas por una ley de la Asamblea Legislativa de Puerto Rico.* ¿Cuál es la importancia de este hecho? Veamos.

El Art. 678 del Código de Enjuiciamiento Civil de Puerto Rico, 32 L.P.R.A. sec. 3524, dispone, en lo pertinente, que:

> *No podrá otorgarse un injunction ni una orden de entredicho:*
>
> . . . . . . . .
>
> *3—Para impedir la aplicación u observancia de cualquier ley de la Asamblea Legislativa de Puerto Rico, o el cumplimiento de cualquier actuación autorizada por ley de la Asamblea Legislativa de Puerto Rico, de un funcionario público,* de una corporación pública, o de una agencia pública, o de cualquier empleado o funcionario de dicha corporación o agencia, *a menos que se hubiera determinado por sentencia final, firme, inapelable e irrevisable, que dicha ley o actuación autorizada por ley es inconstitucional o inválida.*
>
> . . . . . . . .
>
> 5—Para impedir el ejercicio en forma legal de un cargo público o privado, por la persona que estuviera en posesión del mismo. (Énfasis suplido.)

Estando autorizado y obligado por ley el aquí demandado, como hemos visto, a asumir interinamente las funciones del cargo de Secretario del Departamento de Agricultura de Puerto Rico, al producirse la renuncia del secretario en propiedad de dicho departamento y estando, en consecuencia, esa y todas sus demás actuaciones como Secretario Interino autorizadas por leyes de la Asamblea

Legislativa de Puerto Rico, la utilización del recurso de *injunction le estaba vedada* a la parte demandante por disposición expresa, a esos efectos, del citado Art. 678 del Código de Enjuiciamiento Civil de Puerto Rico.

En *Arrarás* v. *Tribunal Superior*, 100 D.P.R. 379, 381 (1972) —caso en que tres estudiantes del Recinto de Mayagüez de la Universidad de Puerto Rico radicaron una "solicitud de entredicho", en la cual alegaron que los demandados José Enrique Arrarás y Rafael Pietri Oms, en su calidad de Rector y Presidente de la Junta de Disciplina, respectivamente, de dicho recinto "les han formulado cargos y se proponen tomar sanciones contra ellos por haber organizado una actividad consistente en un mit[i]n y piquete no autorizado, en violación del inciso 7 del Art. X del Reglamento General de Estudiantes de la Universidad de Puerto Rico" (énfasis suplido); en donde los estudiantes demandantes atacaban la validez de la citada disposición reglamentaria por constituir la misma una violación de sus derechos constitucionales de libre expresión, de reunión y de estudio, y que la "solicitud de entredicho" estaba predicada en los graves e irreparables daños que se le causarían al aplicárseles sanciones que acarrearían la interrupción de sus estudios— este Tribunal, citando como fundamento las disposiciones antes transcritas del Art. 678 del Código de Enjuiciamiento Civil, *y al revocar al tribunal de instancia,* el cual había expedido una orden provisional de entredicho, expresó:

En *Las Monjas Racing Corp.* v. *Com. Hípica,* 67 D.P.R. 45 (1947), al interpretar lo dispuesto en el Art. 678 antes citado *dijimos que la primera determinación a hacerse era si la actuación de la agencia pública era una autorizada por ley, y no si la actuación era válida o constitucional. Y ello es así porque precisamente la validez o constitucionalidad de la actuación es lo que debe decretarse con antelación a la expedición del entredicho o injunction, por sentencia final, firme, inapelable e irrevisable.* En otras palabras, lo determinante es si la actuación está comprendida dentro de la autoridad con-

ferida por ley al funcionario, bien sea gubernamental o de una corporación o agencia pública. Véanse además, *Mari* v. *Vicéns*, 67 D.P.R. 473 (1947); *Jiménez* v. *Jiménez*, 71 D.P.R. 502 (1950). *Cf. Harper* v. *Jones*, 195 F.2d 705 (1952), *cert.* den. 344 U.S. 821 (1952).

. . . . . . . .

Examinadas las disposiciones de la Ley de la Universidad y del Reglamento General de Estudiantes, citadas precedentemente, es evidente que la formulación de cargos y los trámites subsiguientes de celebración de vista, etc. son actuaciones autorizadas. Los funcionarios envueltos actuaron de acuerdo con las disposiciones reglamentarias. Siendo su actuación conforme a la ley, la misma está comprendida dentro de las exclusiones del remedio de *injunction* provistas en el Art. 678 del Código de Enjuiciamiento Civil. Cualquier *injunction* preliminar, permanente o con carácter de entredicho, que fuere expedido en tales circunstancias es nulo e inefectivo. 32 L.P.R.A. sec. 3524.

*El procedimiento de injunction no es el adecuado para la determinación de la constitucionalidad o validez de la actuación de un funcionario de una instrumentalidad, agencia o corporación pública si su actuación tiene base en la ley. Para ello es necesario un juicio ordinario.* La Ley de Sentencias Declaratorias provee un remedio adecuado que puede utilizarse para la determinación de la validez o constitucionalidad de las disposiciones del Reglamento General de Estudiantes contenidas en la formulación de cargos. 32 L.P.R.A. secs. 2991 *et seq.*

No habiéndose demostrado que las actuaciones de los funcionarios universitarios aludidos no están autorizadas por ley o que las disposiciones del Reglamento General de Estudiantes hayan sido declaradas inválidas o inconstitucionales por determinación judicial en sentencia final, firme, inapelable e irrevisable, resolvemos que no procede el recurso de *injunction* para impedir el cumplimiento de la actuación de los demandados en su carácter respectivo de funcionarios de la Universidad de Puerto Rico, estando dichas actuaciones protegidas por la prohibición contenida en la Sec. 3524 del Título 32 de las Leyes de Puerto Rico Anotadas. (Énfasis suplido.) Págs. 384, 386-387.

La doctrina o norma general, establecida desde hace muchos años por este Tribunal y reafirmada en el caso de *Arrarás*, supra, pág. 386, a los efectos de que el "procedimiento de *injunction no es el adecuado* para la determinación de la constitucionalidad o validez de la actuación de un funcionario de una instrumentalidad, agencia o corporación pública *si su actuación tiene base en la ley"*, por cuanto *"precisamente* la validez o constitucionalidad de la actuación es lo que debe decretarse *con antelación* a la expedición del entredicho o *injunction,* por sentencia final, firme, inapelable e irrevisable" (énfasis suplido), está vigente hoy día, no obstante la enmienda que se le hiciera al referido Art. 678 del Código de Enjuiciamiento Civil mediante la Ley Núm. 12 de 8 de agosto de 1974.[4]

La enmienda realizada se refiere a acciones en pro de la vindicación de los derechos civiles *de un individuo* frente al gobierno. *Pierson Muller I* v. *Feijóó,* 106 D.P.R. 838, 846, 852–853 (1978). La inaplicabilidad de dicha enmienda al presente caso, dado los hechos particulares del mismo, es indisputable: aquí no se trata de la vindicación de los derechos de unos individuos frente al gobierno; *como expresa la opinión de la mayoría, se trata de la confrontación de dos ramas "del gobierno en pugna".* [5]

Es por ello que resulta verdaderamente sorprendente el hecho de que la opinión de la mayoría de este Tribunal descarte este señalamiento —el de la improcedencia del recurso de *injunction* debido a la expresa prohibición estatutaria a esos efectos— como uno que "carece . . . de apoyo", aduciendo como fundamento el que "Esta legislación obedeció al propósito de impedir la paralización del gobierno mediante *alegaciones privadas* de inconstitucionalidad. La legislación no

---

[4] En cuanto a la posibilidad de considerar *la misma situación de hechos* del caso de *Arrarás,* supra, de una manera distinta, a la luz de las disposiciones de la citada Ley Núm. 12, *quaere.*

[5] Obsérvese que la opinión mayoritaria ni tan siquiera considera la posibilidad de que la referida enmienda es de aplicación a los hechos del presente caso.

persigue el objetivo de evitar que en pleitos revestidos de alto interés público no se puedan deslindar las respectivas facultades de dos ramas del gobierno en pugna". (Énfasis suplido.) Pág. 612.

Esta aseveración —la misma carece de referencia jurídica alguna— es completa y totalmente errónea. En primer lugar la referida ley no hace distinción alguna entre alegaciones privadas de inconstitucionalidad y pleitos supuestamente revestidos de alto interés público entre dos ramas de gobierno en pugna. En segundo lugar, en la *exposición de motivos* de dicha legislación se expresó que el propósito de la misma era el de evitar la expedición por los tribunales de órdenes de entredicho y de *injunctions* en relación con la observancia de estatutos públicos y demás actuaciones de la administración pública, ya que dichos *injunctions* y entredichos lo que causan es la desorganización en el proceso ordenado del gobierno y la incertidumbre y confusión en la observancia de la ley. (⁶)

¿Qué efectos tendrá la decisión que emite la mayoría de este Tribunal en el día de hoy en el Departamento de Agricultura de Puerto Rico? ¿Tendrá la misma el efecto de desorganizar el proceso ordenado de gobierno y la creación de incertidumbre y confusión en la observancia de la ley?

De momento se nos ocurre —y creemos que es suficiente— que la referida decisión deja "sin cabeza" que dirija, no sabemos por cuánto tiempo, a un importante departamento del Gobierno de Puerto Rico. De la propia opinión

---

(⁶) *"Decrétase por la Asamblea Legislativa de Puerto Rico:*

"Artículo 1—EXPOSICIÓN DE MOTIVOS.—Cualquier ley aprobada por la Asamblea Legislativa de Puerto Rico debe considerarse constitucional a menos que y hasta tanto se le declare nula por sentencia final, firme, inapelable e irrevisable. La expedición de órdenes de entredicho y de *injunctions* por las cortes inferiores, en relación con la observancia de estatutos públicos y demás actuaciones de la administración pública, desorganiza el proceso ordenado de gobierno y crea incertidumbre y confusión en la observancia de la ley por motivo de la diversidad de opiniones entre los distintos jueces en cuanto a la validez o constitucionalidad de diversos estatutos y actos públicos."

de la mayoría del Tribunal se puede inferir que ello puede ser por un largo período. Esto es así debido a que dicha decisión, en su empeño de justificar su conclusión a los efectos de que el señor Gobernador no es parte indispensable en el pleito, indica que "el decreto emitido en instancia no ordena al honorable Gobernador de Puerto Rico a hacer nada" y, más adelante expresa, que "[e]l decreto no le instruye [al Gobernador] a tomar curso alguno de acción". En adición, dada la situación actual en Puerto Rico, [7] podría resultar en un largo período antes de que se consiga a otra persona —calificada para el puesto, que esté dispuesta a aceptarlo, y que sea confirmada por el Senado de Puerto Rico— para llenar la vacante de Secretario en propiedad del departamento en controversia. Mientras eso sucede, ¿quién dirige el referido departamento?

En la opinión de la mayoría se expresa, como segundo fundamento para demostrar la "procedencia" del recurso de *injunction* en esta clase de situaciones, que: "Está *ampliamente* reconocido que un grupo de senadores puede solicitar un *injunction* o una *sentencia declaratoria* para cuestionar la ocupación de un cargo por una persona en detrimento del poder de confirmación del Senado." [8] (Énfasis suplido.) Se cita como única autoridad de lo anteriormente expresado, el caso de *Williams* v. *Phillips*, supra.

El citado caso, en lo que respecta a la utilización del recurso de *injunction* en esta clase de situaciones, es claramente inaplicable y distinguible de la situación de hechos con que nos confrontamos en el presente caso.

En *Williams*, supra, se trataba de la agencia federal conocida como *Office of Economic Opportunities*. Por dispo-

---

[7] Tomamos conocimiento judicial del hecho de que con anterioridad al rechazo del señor López Nieves, el Senado de Puerto Rico había rechazado a otro candidato nominado por el honorable señor Gobernador de Puerto Rico para el cargo de Secretario de Agricultura.

[8] Resulta curioso e interesante el hecho de que "de pasada" se admita la procedencia del remedio de sentencia declaratoria en esta clase de situaciones.

sición expresa de ley, el director de dicha agencia, así como los auxiliares de dicho director, tenían que ser nombrados por el Presidente de Estados Unidos con el consejo y consentimiento del Senado de Estados Unidos. *La ley no proveía para el nombramiento de un director interino.* El Presidente, en contravención a la ley, nombró al demandado Phillips como director interino, sin someter su nombramiento al Senado. Como la ley no provee para el nombramiento de un director en funciones, el demandado estaba ocupando el mencionado cargo ilegalmente, mediante un acto *ultra vires* del Presidente de Estados Unidos. Siendo ello así, era clara la procedencia del recurso de *injunction.*

El caso citado no ilustra que se pueda utilizar un interdicto en contravención a lo dispuesto por nuestro legislador mediante la ley *"anti-injunction".* Por el contrario, la situación de hechos que plantea el referido caso de *Williams,* admitiría la utilización de dicho recurso aun en nuestra jurisdicción; ello debido a que las actuaciones del demandado Williams no eran actuaciones autorizadas por la ley.

En el presente caso, como ya hemos visto a la saciedad, la ley expresamente autoriza al aquí demandado, en ausencia del secretario en propiedad, a desempeñar las labores de Secretario Interino. Como podemos observar, los dos casos son obvia y claramente distintos.

Nos resta por considerar la procedencia del recurso del *quo warranto,* recurso que, de acuerdo con la representación legal de señor López Nieves, es el que debió ser radicado en el presente caso. No le asiste la razón; el mismo resulta igualmente improcedente en derecho, dada la situación particular del presente caso, en que existe una ley que autoriza al señor López Nieves a desempeñar el cargo de Secretario Interino.

Conforme las disposiciones del Art. 641 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3392, el remedio del *quo warranto* procede, entre otras, "Cuando alguna persona usurpare o ilegalmente ejerciere o desempeñare funciones

de algún cargo público".(⁹) Por no ser esa la situación en el caso que nos ocupa, es evidente la improcedencia de dicho recurso.

Ahora bien, el hecho de que a la parte demandante, como hemos visto, le estuviera vedada la utilización de los recursos de *injunction* y de *quo warranto*, ¿significa ello que dicha parte, entendiendo honestamente que estaba en la obligación de vindicar "sus derechos", estaba huérfana de remedio legal alguno? Ciertamente que no.

Lo primero que estaba a su alcance —lo cual discutiremos posteriormente en forma más amplia— era el legislar con el propósito de enmendar, a los efectos de limitar los interinatos, tanto las disposiciones pertinentes del Código Político de Puerto Rico como las leyes orgánicas de los distintos departamentos del Gobierno de Puerto Rico. De no querer así proceder, o de así hacerlo y el honorable señor Gobernador de Puerto Rico entender que debía vetar dichos proyectos de ley, o de resolverse por los tribunales que dichas enmiendas no pueden tener efectos retroactivos, tenía a su alcance el remedio sobre sentencia declaratoria, remedio al cual este Tribunal refirió a los estudiantes demandantes en el caso de *Arrarás* v. *Tribunal Superior*, supra, remedio hoy reglamentado bajo las disposiciones de la Regla 59 de las de Procedimiento Civil de 1979.(¹⁰)

En síntesis, habiendo sido expedido el *injunction* solicitado *bajo la situación de hechos antes expresada*, procede que se decrete, al amparo de las disposiciones del Art. 678

---

(⁹)". . . Quo warranto is generally regarded as an appropriate and adequate remedy to determine the right or title to a public office, and to oust an incumbent who has unlawfully usurped or intruded into such office or is unlawfully holding the same. . . ." (Énfasis suplido.) 42 Am. Jur. 2d *Injunctions* Sec. 44, pág. 784 (1969).

(¹⁰)En el supuesto de que se radicara un recurso sobre sentencia declaratoria, en el cual se estimara como correcta por un tribunal la posición que sostiene la parte demandante y la sentencia así dictada adviniera final, firme e inapelable, sostenemos que sería únicamente entonces que se podría considerar la procedencia del recurso de *injunction.*

del Código de Enjuiciamiento Civil de Puerto Rico y de lo resuelto en *Arrarás* v. *Tribunal Superior*, supra, pág. 386, que el mismo *"es nulo e inefectivo"*. (Énfasis suplido.)

## III

*El tercero ausente o indispensable*

Consideremos si el honorable señor Gobernador de Puerto Rico es o no parte indispensable en el procedimiento. La materia de parte indispensable está regulada en nuestra jurisdicción por la Regla 16.1 de las de Procedimiento Civil de 1979, la cual proviene de la Regla 19(a) de las de Procedimiento Civil federal. La mencionada regla federal sufrió una importante enmienda en el año 1966, enmienda que es la responsable del nuevo enfoque que se le ha dado a la problemática de parte indispensable: la decisión a que se llegue respecto a dicho problema debe ser el resultado de consideraciones prácticas a la luz de las circunstancias de cada caso en particular. *Provident Bank* v. *Patterson*, 390 U.S. 102 (1968). Comentando dicho caso, encontramos en *Moore's Federal Practice* [11] que "The Supreme Court has made it clear, however, that *the new emphasis on practical effect* should not be ignored and the question of proceeding or dismissing for want of parties *must be approached in the light of the circumstances of the particular case*, not according to a priori classifications". (Énfasis suplido.)

En *Wright & Miller, Federal Practice and Procedure: Civil,* [12] se expresa que "There is *no precise formula* for determining whether a particular nonparty must be joined under Rule 19(a). The decision has to be made in terms of the general policies *of avoiding multiple litigation, providing the parties with complete and effective relief in a single action, and protecting the absent persons from the possible perjudicial effect of deciding the case without them.* Account

---

[11] Vol. 3A, Sec. 19.05(1), pág. 19-84 (1984).

[12] Vol. 7, Sec. 1604, pág. 35 (1972).

also must be taken of whether other alternatives are available to the litigants". (Énfasis suplido, escolio omitido.)

Por último, se debe tener presente *la situación particular* que presenta este caso dentro de la mencionada problemática de parte indispensable: si el principal o funcionario de mayor jerarquía es o no parte indispensable en un pleito en que se demanda a su subordinado. El caso normativo, respecto a esta clase de situaciones, lo es el de *Williams* v. *Fanning*, 332 U.S. 490 (1947). Comentando el referido caso, en *Wright & Miller* ([13]) se expresa que: "The Court then established the principle that the superior officer is an indispensable party only *'if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him'.* For 'if the decree which is entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court' the superior governmental official is not an indispensable party." (Énfasis suplido, escolios omitidos.)

A la luz de los principios arriba expresados, procedemos a determinar si el honorable señor Gobernador de Puerto Rico es o no parte indispensable:

A—La decisión a la que se llegue debe ser el resultado de consideraciones prácticas a la luz de las circunstancias presentes en el caso. *Provident Bank* v. *Patterson*, supra.

Hemos visto que de acuerdo con la norma jurídica imperante en esta jurisdicción un subsecretario de un departamento ejecutivo del Gobierno de Puerto Rico, en el caso de separación del cargo, muerte o renuncia del secretario en propiedad, viene obligado, y autorizado, a desempeñar el cargo de secretario interino del referido departamento, hasta tanto "se nombre e instale el respectivo sucesor".

¿En manos de qué funcionario del Gobierno de Puerto Rico está el nombrar "el respectivo sucesor" del secretario renunciante?

---

([13]) *Supra,* Sec. 1622, pág. 222.

¿Quién es el funcionario del Gobierno de Puerto Rico que puede, por su acción, alterar la situación existente en el Departamento de Agricultura?

¿Quién es el funcionario del Gobierno de Puerto Rico que puede explicar las razones que existen, si alguna, por las cuales no se ha cubierto la vacante del cargo de secretario en propiedad del Departamento de Agricultura?

La opinión mayoritaria sostiene que este pleito es uno revestido de alto interés público; que se trata de dos ramas del gobierno en pugna; y que el asunto de si una parte es o no indispensable *"es de orden tan relevante y vital* que puede presentarse en apelación por primera vez o aun suscitarse por este Tribunal *sua sponte"*. (Énfasis suplido.) Siendo ello así y en vista de que resulta sumamente conveniente a los mejores intereses del Pueblo de Puerto Rico el que la implantación de la política pública, por parte del Departamento de Agricultura, no sea interrumpida innecesariamente, ¿no sería más propio y razonable que se le conceda al Primer Ejecutivo del país, máximo representante de la Rama Ejecutiva del Gobierno de Puerto Rico, *la oportunidad* de ser oído y así poder contar con el beneficio de su posición antes de emitir una decisión que puede tener consecuencias tan graves para el Pueblo de Puerto Rico?

¿Acaso no debe ser ahora la acumulación obligatoria de partes —según expresa y acepta la propia opinión de la mayoría— "el resultado *tan solo* de consideraciones pragmáticas"?

¿Qué era lo más "práctico" en el presente caso: resolver el mismo en presencia o en ausencia del honorable señor Gobernador de Puerto Rico?

B—La decisión a la que se llegue debe proveer a las partes un completo y efectivo remedio de una sola vez, evitar nueva litigación y proteger al ausente del posible efecto perjudicial de haberse resuelto el caso sin dársele la oportunidad de ser oído, *Wright & Miller*, supra, Sec. 1601, pág. 35.

Recordemos que la alegación principal de la parte demandante es a los efectos de que el poder ejecutivo, mediante la ,utilización del Subsecretario demandado como Secretario Interino del Departamento de Agricultura, le está violando o despojando del poder de confirmación que confiere al Senado de Puerto Rico la Constitución de Puerto Rico.

La opinión dé la mayoría resuelve o dispone que el señor López Nieves cesará automáticamente en sus funciones de Secretario Interino de Agricultura a los treinta días de la fecha de la notificación de la sentencia que se emita en el presente caso. Procede que nos preguntemos: ¿En qué se beneficia o mejora la situación del Senado de Puerto Rico con esta decisión? ¿Cesa con la misma, en su totalidad, la supuesta violación del poder de confirmación del Senado de Puerto Rico?

Si el honorable señor Gobernador de Puerto Rico —siguiendo los consejos que le ofrece la opinión de este Tribunal, a los efectos de que él puede resolver no hacer nada por cuanto "[e]l decreto [emitido por el tribunal de instancia] no le instruye a tomar curso alguno de acción"— decide no actuar y como consecuencia de ello sencillamente se cruza de brazos, ¿no procedería que el Senado, nuevamente, en supuesta vindicación de sus poderes de confirmación, viniera obligado a recurrir a los tribunales de justicia para "obligar" al señor Gobernador de Puerto Rico a nombrar un secretario en propiedad del Departamento de Agricultura?

En vista de ello, ¿provee a las partes la decisión que se emite en el día de hoy, un completo y efectivo remedio y evita la misma futura litigación?

C—El funcionario de superior jerarquía será parte indispensable en un pleito en que se haya demandado a su subordinado, únicamente si la decisión que concede el remedio solicitado requiere de dicho funcionario de superior jerarquía tomar alguna acción. *Williams* v. *Fanning*, supra.

La opinión mayoritaria, con el propósito obvio de evitar la norma establecida en el caso de *Williams* v. *Fanning*, supra, expresa, repetimos, que "[e]l decreto emitido en instancia no ordena al honorable Gobernador de Puerto Rico a hacer nada". ¿Es realmente correcta esta aseveración? ¿No está obligado el Gobernador de Puerto Rico por la Constitución del Estado Libre Asociado de Puerto Rico a "[c]umplir y hacer cumplir las leyes"? Si meramente se cruza de brazos, ¿no queda el Departamento de Agricultura sin funcionario alguno que lo dirija y que implante su programa? ¿Cumple de esa forma el Gobernador con el arriba expresado mandato constitucional? ¿No es cierto, entonces, que la decisión del Tribunal en el presente caso requiere del Gobernador tomar alguna acción? ¿No es el Gobernador, en su consecuencia, parte indispensable en este procedimiento?

En síntesis —a los fines de la argumentación y presumiendo que la parte demandante hubiera acudido ante el foro judicial mediante el recurso correcto y apropiado— por las razones antes expresadas, entendemos que la parte demandante venía obligada a incluir como parte demandada al honorable señor Gobernador de Puerto Rico. [14]

Igualmente, entendemos que al no hacerlo así la parte demandante, el tribunal de instancia, en el descargo responsable de sus funciones y teniendo la facultad para hacerlo, venía obligado, antes de dictar la sentencia sumaria que emitió, a ordenar que el señor Gobernador de Puerto Rico fuera incluido como parte demandada. Sobre todo, cuando consideramos que el fundamento principal que aduce dicho tribunal en apoyo de la sentencia que emite es que el responsable de la situación imperante en el Departamento de Agricultura lo era el señor Gobernador por

---

[14] Recuérdese que, como surge del escolio (2), *ante*, la parte demandante, en el párrafo número 7 de la demanda que radicara, específicamente le imputa al señor Gobernador el haber hecho una serie de manifestaciones respecto a la cuestión en controversia.

cuanto, según el referido tribunal, el "mantener al demandado ejerciendo las funciones reales del cargo es soslayar la voluntad del Senado".

Resulta para nosotros inconcebible que un tribunal de justicia responsabilice a una "parte" sin previamente haberle concedido —*estando en su poder el así hacerlo*— la oportunidad de tener su "día en corte".

La opinión de la mayoría lo que hace es confirmar este reprochable error. Este Tribunal, en su intento por justificar dicha errónea posición aduce que "surge de autos que el honorable Gobernador de Puerto Rico estaba enterado del pleito", y que su "propio abogado, el Secretario de Justicia, fue quien contrató la representación legal del demandado".

En primer lugar, el honorable Secretario de Justicia de Puerto Rico *es el abogado del Estado Libre Asociado de Puerto Rico* —véase el Art. 64 del Código Político, 3 L.P.R.A. sec. 72— y no meramente el "abogado del Gobernador".

En segundo lugar, de acuerdo con las disposiciones del Art. 1 de la Ley Núm. 27 de 2 de julio de 1947 (3 L.P.R.A. sec. 103), el Secretario de Justicia está autorizado, a solicitud de una instrumentalidad o corporación pública del Estado Libre Asociado de Puerto Rico, para contratar abogados en la práctica privada de la profesión, para que comparezcan a los tribunales en representación de los intereses de dichas instrumentalidades o corporaciones públicas.[15]

En tercer lugar, a pesar de que es un hecho cierto que el honorable Secretario de Justicia de Puerto Rico fue emplazado en el presente caso, dicho funcionario no fue emplazado, como aparentemente insinúa la opinión del Tribunal, como "abogado del Gobernador". Fue emplazado por la parte demandante en cumplimiento de las disposiciones, a esos efectos, de la Regla 4.4(g) de las de Procedimiento Civil de 1979, que expresamente disponen que cuando se de-

---

[15] Inclusive lo ha hecho en relación con casos en que los Señores Jueces de este Tribunal han sido demandados en su capacidad como tales.

manda a un funcionario —en este caso, a Carlos J. López Nieves— o a una instrumentalidad del Estado Libre Asociado de Puerto Rico, que no fuere una corporación pública, se diligenciará el emplazamiento "entregando copia . . . a dicho funcionario o al jefe ejecutivo de dicha instrumentalidad *y al Secretario de Justicia*". (Énfasis suplido.) Es un hecho incuestionable que cuando se emplaza por mandato de dicha regla de procedimiento civil al Secretario de Justicia, *no* se entiende, bajo ningún concepto, que el Gobernador de Puerto Rico ha sido emplazado.

Ahora bien, no hay duda de que es muy posible que por ser éste un pleito "revestid[o] de [gran] interés público", el señor Gobernador de Puerto Rico se debe haber enterado de la demanda que radicara el Senado de Puerto Rico; al igual que es muy probable que los funcionarios que fueron emplazados le deben haber informado del mismo.

Amparado en ello, la opinión de la mayoría de este Tribunal insinúa que estuvo al alcance del señor Gobernador el haber radicado una solicitud de intervención en el pleito, al amparo de la Regla 21 de las de Procedimiento Civil de 1979 y que no lo hizo así. *¿Realmente tuvo la oportunidad para ello? Creemos que no.* Recordemos que una vez se radicó la demanda, la parte demandada presentó una moción de desestimación y/o de sentencia sumaria, en relación con la cual el tribunal de instancia señaló una vista; celebrada la misma, el tribunal, prontamente, dictó la sentencia que hoy revisamos. Es evidente que no hubo oportunidad de intervenir.

## IV

*La duración o término de los interinatos*

En la jurisdicción federal existen disposiciones similares a las del citado Art. 172 del Código Político de Puerto Rico.[16] Se dispone, en términos generales, que en caso de

---

[16] Véase, en general, 5 U.S.C. secs. 3345-3349 (1976).

que el jefe de un departamento ejecutivo del Gobierno de los Estados Unidos muera, renuncie, se enferme o se ausente, su primer asistente o, por excepción, el jefe de otro departamento ejecutivo que para ello sea designado por el Presidente, ocupará y desempeñará interinamente el cargo del referido funcionario.

*En dicha jurisdicción, sin embargo, el término o duración del interinato está expresamente reglamentado por estatuto.* ([17]) Originalmente se legisló —*en el 1868*— que dicho interinato no podía exceder de diez (10) días. *En el 1891* se enmendó la ley a los efectos de aumentar el referido período a treinta (30) días, período vigente en la actualidad.

Por cuanto nuestra Asamblea Legislativa *nunca* ha legislado en forma similar a la del Congreso de los Estados Unidos para limitar el término o duración de los interinatos, la norma imperante y única, respecto a esta materia en nuestra jurisdicción, la constituyen las disposiciones a esos efectos del anteriormente transcrito Art. 172 del Código Político de Puerto Rico.

Confrontada con la inescapable realidad jurídica de que la decisión emitida por el tribunal de instancia no puede prevalecer, por razón de que conflige con las expresas disposiciones en contrario del citado Art. 172, y con el propósito de justificar su decisión confirmatoria de la misma, la opinión de la mayoría elabora una teoría mediante la cual divide la "historia de las Asambleas Legislativas de Puerto Rico" en dos períodos: "preconstitución" y "postconstitución" del Estado Libre Asociado de Puerto Rico.

Señala que el antes citado Art. 172 advino a nuestro ordenamiento jurídico con anterioridad al 1952. Como fundamento para *la total apatía* de la Asamblea Legislativa respecto al mismo durante la "época preconstitución", asevera que la inacción se debió a que se trataba de una Asamblea Legislativa "trunca", en una época en que "no existía un Senado responsable al pueblo", y que era un "poder

---

([17]) 5 U.S.C. sec. 3348 (1976).

legislativo . . . sujeto a tales cortapisas que no era razonable pensar que éste pudiese podar las facultades del gobernador nombrado por la metrópoli".

Aparte de que dichas aseveraciones, por razones que expresaremos más adelante, son erróneas, las mismas constituyen, en nuestra humilde opinión, una inmerecida y gratuita ofensa a todos aquellos buenos y responsables puertorriqueños que durante años laboraron incansablemente como miembros no remunerados de las distintas Asambleas Legislativas, época que produjo seres humanos extraordinarios que todavía son recordados, por algunos de nosotros, con reverencia, respeto y admiración, y que se trata de servidores públicos de excelencia, que no se merecen, por inferencia, el mote o calificativo de sometidos e irresponsables.

Las mencionadas aseveraciones, como ya dijimos, son completamente erróneas: las mismas se caen por su propio peso, al tomarse en consideración que *las Asambleas Legislativas* en la llamada "época *post*constitución" —ya supuestamente, según la teoría de la mayoría, no truncas ni sujetas a los mandatos de la metrópoli— tampoco tomaron acción legislativa alguna para limitar el término o duración de los interinatos. *Por el contrario, no sólo ratificaron la disposición legal antes mencionada, sino que en varias ocasiones aprobaron legislación idéntica, relativa a departamentos de nueva creación en el Gobierno de Puerto Rico.* [18]

---

[18] Así, por ejemplo, tenemos que al crearse *en el 1969* el Departamento de Servicios Sociales, *la Asamblea Legislativa* dispone, en lo pertinente, que: "En caso de muerte, *renuncia* o separación del cargo del Secretario, el *Subsecretario* de Servicios Sociales *ejercerá todas las funciones de aquél* como Secretario de Servicios Sociales Interino, *mientras dure la vacante.*" (Énfasis suplido.) 3 L.P.R.A. sec. 211c(f).

*En el 1972*, al crearse el Departamento de la Vivienda, se dispuso por *la Asamblea Legislativa* de Puerto Rico, en lo pertinente, que: "En caso de muerte, *renuncia* o separación del cargo de Secretario, el Subsecretario *ejercerá* todas la funciones de aquél como Secretario interino *mientras dure la vacante.*" (Énfasis suplido.) 3 L.P.R.A. sec. 441c(c).

*En el 1973*, al crearse el Departamento de Servicios contra la Adicción, se dispuso por *la Asamblea Legislativa* de Puerto Rico, en lo pertinente, que: "En

Esta aplastante realidad destruye en su totalidad la teoría de una Asamblea Legislativa "preconstitución" "trunca" y "sujeta a los mandatos de la metrópoli". La misma es prueba irrefutable de la clara y expresa intención legislativa, *a través de toda nuestra historia de pueblo*, a los efectos de que en caso de que ocurra una vacante en la posición de secretario en propiedad de uno de los departamentos ejecutivos del Gobierno de Puerto Rico, el subsecretario de ese departamento está autorizado para ejercer, como secretario interino, las funciones y deberes del secretario "mientras se nombre e instale el respectivo sucesor", como dispone el citado Art. 172 del Código Político *o*, lo que es lo mismo, "mientras dure la vacante", como disponen las distintas leyes orgánicas antes citadas.

Aparentemente consciente. de ello, la opinión de la mayoría hace la aseveración [19] de que el citado Art. 172 "responde a una filosofía superada ya por nuestro ordenamiento jurídico", que su alcance ha quedado afectado por la Constitución del Estado Libre Asociado de Puerto Rico, y que "[l]lega un momento en todo interinato en que se activa la cláusula de separación de poderes y el interinato tiene que cesar". [20]

No tenemos duda de que el advenimiento a nuestro ordenamiento jurídico, en el 1952, de la Constitución del Estado Libre Asociado ha afectado todo el sistema normativo nuestro. Tenemos serias dudas, sin embargo, de que el citado Art. 172 del Código Político responda "a una filosofía superada ya por nuestro ordenamiento jurídico", cuando lo

---

caso de muerte, *renuncia* o separación del Secretario, el Subsecretario *ejercerá* todas las funciones y deberes de aquél como Secretario Interino, *mientras dure la vacante.*" (Énfasis suplido.) 3 L.P.R.A. sec. 401b.

[19] La cual carece de referencia jurídica alguna.

[20] Fundamento no alegado por la parte demandante al acudir ante el tribunal de instancia. Recuérdese que únicamente se alegó por dicha parte que las actuaciones del señor López eran ilegales "dado el rechazo de su designación por parte del Senado de Puerto Rico".

cierto es que tan reciente como en 1973 la Asamblea Legislativa de Puerto Rico [21] aprobó una ley que contiene, básicamente, el mismo enfoque y mandato de dicho artículo. [22]

Es debido a ello que a la opinión de la mayoría de este Tribunal no le queda otra alternativa, en justificación de su decisión, que "enmendar judicialmente" las disposiciones de ley antes citadas, aduciendo que "[l]lega un momento en todo interinato en que se activa la cláusula de separación de poderes y el interinato tiene que cesar", so pena de convertirse en inconstitucional. Mediante esta "enmienda" se introduce un término a los interinatos aquí en controversia, que nunca fue concebido por nuestro legislador.

Nuestra Asamblea Legislativa, a través de toda su historia, ha entendido que las disposiciones del citado Art. 172 del Código Político, así como las disposiciones de las distintas leyes orgánicas de los diferentes departamentos ejecutivos del Gobierno de Puerto Rico, constituyen sanos principios de una buena administración pública —por cuanto facilitan la continuidad, en evitación de la desorganización administrativa que puede sobrevenir como consecuencia de la vacante— los cuales este Tribunal tiene la obligación de respetar, promover y fomentar. [23] Intercalarle a dicha dis-

---

[21] Dominada entonces por el mismo partido político que la domina en la actualidad.

[22] Debe observarse que la Asamblea Legislativa, al aprobar las respectivas leyes orgánicas de los Departamentos de Servicios Sociales, de la Vivienda y de Servicios contra la Adicción, revirtió a la utilización de la palabra "ejercerá" del Art. 172 del Código Político, en sustitución de la palabra "podrá" del Art. 7 de la ley que creó el Departamento de Agricultura.

Ello, a nuestro entender, fortalece aún más la posición que sostenemos respecto a cuál ha sido siempre la "intención legislativa" en este aspecto.

[23] Debemos tener presente que el Senado de Puerto Rico *no es la "Asamblea Legislativa"*; es meramente *parte* de ella, ya que ésta se compone, como sabemos, de *dos* cuerpos: el Senado y la Cámara de Representantes. El citado Art. 172 del Código Político y las leyes que crearon los distintos departamentos ejecutivos del Gobierno de Puerto Rico *fueron el producto del trabajo de los dos cuerpos legislativos.* Las preferencias y deseos del Senado, por más respetables que sean, *no son índice absoluto de lo que constituye la intención de la Asamblea Legislativa de Puerto Rico.*

posición de ley por *fíat judicial* la "restricción" propuesta por la opinión de la mayoría, nos parece un tradicional caso de *legislación judicial* no autorizado ni deseado. Véase: *Román* v. *Superintendente de la Policía,* 93 D.P.R. 685 (1966). Ello es así, en especial cuando, como en el presente caso, se hace una determinación constitucional de esa índole, no obstante el hecho de que el recurso utilizado es improcedente en derecho. *E.L.A.* v. *Aguayo,* 80 D.P.R. 552, 596 (1958).

En adición tenemos que la norma jurisprudencial establecida en el día de hoy cobija o aplica a *"todo* interinato" sin tomar en consideración que los aludidos principios de una buena administración pública pueden exigir, en determinado momento, un tratamiento distinto para determinada situación o departamento ejecutivo del gobierno. Ejemplo extraordinario de la flexibilidad que debe regir esta materia lo es la esfera federal. En la misma —en donde como hemos visto anteriormente, el Congreso de Estados Unidos en el ejercicio responsable de sus deberes legisló, desde el siglo pasado, con el propósito de limitar a treinta días los interinatos— se ha interpretado y resuelto que el término dispuesto como válido para el desempeño de los interinatos aplica de forma distinta al Departamento de Justicia de Estados Unidos, pudiéndose extender el ejercicio interino de funciones en la dirección de esa dependencia gubernamental hasta que la vacante sea cubierta. *United States* v. *Lucido,* 373 F.Supp. 1142 (1974); todo ello con el propósito y objetivo de garantizar el ejercicio continuado de las funciones vitales de la referida agencia.

El establecimiento del principio rígido e inflexible, a los efectos de que llega un momento en que *todo* interinato en la dirección de *cualesquiera* de los departamentos ejecutivos del Gobierno de Puerto Rico tiene que cesar, por razón de activarse la cláusula de separación de poderes de nuestra Constitución —sin que se tome en consideración las necesidades, deberes y prerrogativas de esa Rama Ejecutiva— cons-

tituye, en nuestra opinión, un atentado contra la cláusula de separación de poderes similar al alegado y sostenido por la mayoría y al que hoy se le pretende poner fin mediante la opinión que se emite.

En conclusión, la solución del problema no está en la presente intervención prematura e indebida de la Rama Judicial en favor de la Rama Legislativa y en perjuicio de la Rama Ejecutiva y, en última instancia, en perjuicio de los mejores intereses del Pueblo de Puerto Rico. La solución siempre ha estado y está al alcance de la Asamblea Legislativa de Puerto Rico: si así lo estima conveniente dicha rama, debe —como lo hiciera el Congreso de Estados Unidos— legislar con el propósito de limitar la duración de los interinatos; sobre todo cuando consideramos que la Rama Legislativa tiene a su alcance todos los recursos adecuados para evaluar profunda y concienzudamente todos los elementos pertinentes a esta materia.

La Rama Judicial no existe para hacer el trabajo de las otras ramas del gobierno. Como expresáramos hace más de sesenta (60) años en *Dottin* v. *Rigo & Co.*, 22 D.P.R. 405, 409 (1915): "El poder judicial no puede suplir la acción del poder legislativo imponiendo a los demandados condiciones que la Legislatura no ha tenido a bien imponerles, absteniéndose como se ha abstenido de legislar sobre la materia."

Por las razones antes expresadas, la sentencia dictada en el presente caso por el honorable Tribunal Superior de Puerto Rico, Sala de San Juan, debería ser revocada.